## THE DANIEL BALL.

1. The doctrine of the common law as to the navigability of waters has no application in this country. Here the ebb and flow of the tide do not constitute the usual test, as in England, or any test at all of the navigability of waters.

2. The test by which to determine the navigability of our rivers is found in their navigable capacity. Those rivers are public navigable rivers in law which are navigable in fact.

3. Rivers are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

4. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water.

5. Grand River, in Michigan, held to be a navigable water of the United States, from its mouth in Lake Michigan to Grand Rapids, a distance of forty miles, being a stream capable of bearing for that distance a steamer of one hundred and twenty-three tons burden, laden with merchandise and passengers, and forming by its junction with the lake a continued highway for commerce, both with other States and with foreign countries.

6. The limitation of the power of Congress over commerce to commerce among the several States, with foreign nations, and with the Indian tribes, necessarily excludes from Federal control all that commerce which is carried on entirely within the limits of a State, and does not extend to or affect other States.

7. The steamer in this case being employed in transporting goods on Grand River, within the State of Michigan, destined for other States, and goods brought from without the limits of Michigan and destined to places within that State, was engaged in commerce between the States, and however limited that commerce, was, so far as it went, subject to the legislation of Congress. She was employed as an instrument of that commerce; for whenever a commodity has begun to move as an article of trade from one State to another, commerce in that commodity between the States has commenced. The fact that several different and independent agencies are employed in transporting the commodity, some acting entirely in one State, and some acting through two or more States, does not affect the character of the transaction. To the extent to which each agency acts in that transportation, it is subject to the regulation of Congress.

APPEAL from the Circuit Court for the Western District of Michigan, the case being thus:

The act of July 7th, 1838,* provides, in its second section, that it shall not be lawful for the owner, master, or captain of any vessel, propelled in whole or in part by steam, to transport any merchandise or passengers upon " the bays, lakes, rivers, or other navigable waters of the United States," after the 1st of October of that year, without having first obtained from the proper officer a license under existing laws; that for every violation of this enactment the owner or owners of the vessel shall forfeit and pay to the United States the sum of five hundred dollars; and that for this sum the vessel engaged shall be liable, and may be seized and proceeded against summarily by libel in the District Court of the United States.

The act of August 30th, 1852,† which is amendatory of the act of July 7th, 1838, provides for the inspection of vessels propelled in whole or in part by steam and carrying passengers, and the delivery to the collector of the district of a certificate of such inspection, before a license, register, or enrolment, under either of the acts, can be granted, and declares that if any vessel of this kind is navigated with passengers on board, without complying with the terms of the act, the owners and the vessel shall be subject to the penalties prescribed by the second section of the act of 1838.

In March, 1868, the Daniel Ball; a vessel propelled by steam, of one hundred and twenty-three tons burden, was engaged in navigating Grand River, in the State of Michigan, between the cities of Grand Rapids and Grand Haven, and in the transportation of merchandise and passengers between those places, without having been inspected or licensed under the laws of the United States; and to recover the penalty, provided for want of such inspection and license, the United States filed a libel in the District Court for the Western District of Michigan.

---

* 5 Stat. at Large, 304.          † 10 Id. 61.

The libel, as amended, described Grand River as a navigable water of the United States; and, in addition to the employment stated above, alleged that in such employment the steamer transported merchandise, shipped on board of her, destined for ports and places in States other than the State of Michigan, and was thus engaged in commerce between the States.

The answer of the owners, who appeared in the case, admitted substantially the employment of the steamer as alleged, but set up as a defence that Grand River was not a navigable water of the United States, and that the steamer was engaged solely in domestic trade and commerce, and was not engaged in trade or commerce between two or more States, or in any trade by reason of which she was subject to the navigation laws of the United States, or was required to be inspected and licensed.

It was admitted, by stipulation of the parties, that the steamer was employed in the navigation of Grand River between the cities of Grand Rapids and Grand Haven, and in the transportation of merchandise and passengers between those places; that she was not enrolled and licensed for the coasting trade; that some of the goods that she shipped at Grand Rapids and carried to Grand Haven were destined and marked for places in other States than Michigan, and that some of the goods which she shipped at Grand Haven came from other States and were destined for places within that State.

It was also admitted that the steamer was so constructed as to draw only two feet of water, and was incapable of navigating the waters of Lake Michigan; that she was a common carrier between the cities named, but did not run in connection with or in continuation of any line of steamers or vessels on the lake, or any line of railway in the State, although there were various lines of steamers and other vessels running from places in other States to Grand Haven carrying merchandise, and a line of railway was running from Detroit which touched at both of the cities named.

The District Court dismissed the libel. The Circuit Court

reversed this decision, and gave a decree for the penalty demanded.

From this decree the case was brought by appeal to this court.

*Mr. A. T. McReynolds, for the appellant:*

1. The steamer Daniel Ball is not liable under the navigation laws, unless she was employed upon the *navigable waters of the United States,* in carrying on commerce among the States.

What, then, is meant by the term "navigable waters of the United States," and the kindred phrases employed in the navigation laws? And does Grand River fall within the class?

It is clear that the term is not employed in a territorial sense; merely or primarily to include all waters within the territorial limits of the United States, to which the term "navigable" is applied in American law. We have extended that term to include not simply the tide-waters, as is understood by it in England, but also the great fresh-water rivers and lakes of our country; and, in a still broader sense, we apply it to every stream or body of water, susceptible of being made, in its natural condition, a highway for commerce, even though that trade be nothing more than the floating of lumber in rafts or logs.*

But if merely because a stream is a highway it becomes a navigable water of the United States, in a sense that attaches to it and to the vessels trading upon it the regulating control of Congress, then every highway must be regarded as a highway of the United States, and the vehicles upon *it* must be subject to the same control. But this will not be asserted on the part of the government.

The navigable rivers of the United States pass through States, they form their boundary lines, they are not in any one State, nor the exclusive property of any one, but are common to all. To make waters navigable waters of the

---

* Brown *v.* Chadbourne, 31 Maine, 9; Morgan *v.* King, 35 New York, 454; Moore *v.* Sanborne, 2 Michigan, 519.

United States, some other incident must attach to them besides the territorial and the capability for public use.

This term contrasts with *domestic* waters of the United States, and implies, not simply that the waters are public and within the Union, but that they have attached to them some circumstance that brings them within the scope of the sovereignty of the United States as defined by the Constitution.

Grand River, we maintain, is a domestic stream, and not a navigable water of the United States. It is not brought within the sphere of the sovereignty of the United States as defined in the Constitution, unless it be by becoming a highway for the commerce which Congress can regulate. By the Constitution, Congress regulates commerce with foreign nations, among the several States, &c. No such commerce is carried on upon Grand River. Commerce means an exchange of commodities. This river is entirely within the State of Michigan, and therefore an exchange of commodities between two States cannot be made upon it. It is navigated by vessels, the commencement and termination of whose voyage is within the State. It is not adapted to navigation by lake-going vessels, which alone could carry on commerce between the port at its mouth and any other State. It cannot, therefore, be said to be a public water of the United States, because forming part of a continuous route for vessels engaged in interstate trade.

The framers of the Constitution supposed that the State would be best able to establish all necessary regulations for commerce carried on between citizens of the same State; and all proper police regulations for domestic highways. They have not authorized Congress to interfere, and Congress has never done so by attempting to subject this stream to regulations specially applicable to it. The case falls within that of *Veazie* v. *Moor*.* There, as here, the stream was navigable; but there, as here, its natural condition precluded its being used for continuous voyages from one State to another.

* 14 Howard, 569.

2. If Grand River is a navigable water or river of the United States, the steamer was not engaged in carrying on commerce among the States. So far as her passenger trade was concerned, she was engaged in internal commerce; as she transported passengers solely between Grand Haven and Grand Rapids, and the landings on the river between those places, in the State of Michigan. It makes no difference that packages were put on board the steamer plying on Grand River, destined and marked for ports and places in States other than the State of Michigan. It is admitted that she did not take these packages out of the State, nor did she run in connection with any vessels that did; she simply took packages at one place in the State of Michigan, to be delivered at another place in the same State, to some party who appears by a direction on the packages to be expected to find some other conveyance for them to a distant point. We do not know from this record that such conveyance was ever found. But found or not, the owners of this vessel had nothing to do with it. Their operations were confined entirely to the State, and did not, even by contract, extend beyond its limits.

It seems clear, therefore, that this steamer was engaged exclusively in domestic trade. If it was not, there is no such thing as the domestic trade of a State, and Congress may take jurisdiction of the whole commerce of the country. Railroads entirely within a State, which transport grain or fruit destined eventually to a distant market, may be subjected to police regulations from Congress.

*Mr. Bristow, Solicitor-General, contra, for the United States.*

Mr. Justice FIELD, after stating the case, delivered the opinion of the court, as follows:

Two questions are presented in this case for our determination.

First: Whether the steamer was at the time designated in the libel engaged in transporting merchandise and passengers on a navigable water of the United States within the meaning of the acts of Congress; and,

Second: Whether those acts are applicable to a steamer engaged as a common carrier between places in the same State, when a portion of the merchandise transported by her is destined to places in other States, or comes from places without the State, she not running in connection with or in continuation of any line of steamers or other vessels, or any railway line leading to or from another State.

Upon the first of these questions we entertain no doubt. The doctrine of the common law as to the navigability of waters has no application in this country. Here the ebb and flow of the tide do not constitute the usual test, as in England, or any test at all of the navigability of waters. There no waters are navigable in fact, or at least to any considerable extent, which are not subject to the tide, and from this circumstance tide water and navigable water there signify substantially the same thing. But in this country the case is widely different. Some of our rivers are as navigable for many hundreds of miles above as they are below the limits of tide water, and some of them are navigable for great distances by large vessels, which are not even affected by the tide at any point during their entire length.* A different test must, therefore, be applied to determine the navigability of our rivers, and that is found in their navigable capacity. Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water.

---

* The Genesee Chief, 12 Howard, 457; Hine v. Trevor, 4 Wallace, 555

If we apply this test to Grand River, the conclusion follows that it must be regarded as a navigable water of the United States. From the conceded facts in the case the stream is capable of bearing a steamer of one hundred and twenty-three tons burden, laden with merchandise and passengers, as far as Grand Rapids, a distance of forty miles from its mouth in Lake Michigan. And by its junction with the lake it forms a continued highway for commerce, both with other States and with foreign countries, and is thus brought under the direct control of Congress in the exercise of its commercial power.

That power authorizes all appropriate legislation for the protection or advancement of either interstate or foreign commerce, and for that purpose such legislation as will insure the convenient and safe navigation of all the navigable waters of the United States, whether that legislation consists in requiring the removal of obstructions to their use, in prescribing the form and size of the vessels employed upon them, or in subjecting the vessels to inspection and license, in order to insure their proper construction and equipment. "The power to regulate commerce," this court said in *Gilman* v. *Philadelphia*,* "comprehends the control for that purpose, and to the extent necessary, of all navigable waters of the United States which are accessible from a State other than those in which they lie. For this purpose they are the public property of the nation, and subject to all the requisite legislation of Congress."

But it is contended that the steamer Daniel Ball was only engaged in the internal commerce of the State of Michigan, and was not, therefore, required to be inspected or licensed, even if it be conceded that Grand River is a navigable water of the United States; and this brings us to the consideration of the second question presented.

There is undoubtedly an internal commerce which is subject to the control of the States. The power delegated to Congress is limited to commerce "among the several States,"

---

* 3 Wallace, 724.

with foreign nations, and with the Indian tribes. This limitation necessarily excludes from Federal control all commerce not thus designated, and of course that commerce which is carried on entirely within the limits of a State, and does not extend to or affect other States.* In this case it is admitted that the steamer was engaged in shipping and transporting down Grand River, goods destined and marked for other States than Michigan, and in receiving and transporting up the river goods brought within the State from without its limits; but inasmuch as her agency in the transportation was entirely within the limits of the State, and she did not run in connection with, or in continuation of, any line of vessels or railway leading to other States, it is contended that she was engaged entirely in domestic commerce. But this conclusion does not follow. So far as she was employed in transporting goods destined for other States, or goods brought from without the limits of Michigan and destined to places within that State, she was engaged in commerce between the States, and however limited that commerce may have been, she was, so far as it went, subject to the legislation of Congress. She was employed as an instrument of that commerce; for whenever a commodity has begun to move as an article of trade from one State to another, commerce in that commodity between the States has commenced. The fact that several different and independent agencies are employed in transporting the commodity, some acting entirely in one State, and some acting through two or more States, does in no respect affect the character of the transaction. To the extent in which each agency acts in that transportation, it is subject to the regulation of Congress.

It is said that if the position here asserted be sustained, there is no such thing as the domestic trade of a State; that Congress may take the entire control of the commerce of the country, and extend its regulations to the railroads within a State on which grain or fruit is transported to a distant market.

---

* Gibbons v. Ogden, 9 Wheaton, 194, 195.

We answer that the present case relates to transportation on the navigable waters of the United States, and we are not called upon to express an opinion upon the power of Congress over interstate commerce when carried on by land transportation. And we answer further, that we are unable to draw any clear and distinct line between the authority of Congress to regulate an agency employed in commerce between the States, when that agency extends through two or more States, and when it is confined in its action entirely within the limits of a single State. If its authority does not extend to an agency in such commerce, when that agency is confined within the limits of a State, its entire authority over interstate commerce may be defeated. Several agencies combining, each taking up the commodity transported at the boundary line at one end of a State, and leaving it at the boundary line at the other end, the Federal jurisdiction would be entirely ousted, and the constitutional provision would become a dead letter.

We perceive no error in the record, and the decree of the Circuit Court must be                         AFFIRMED.