# The Hazel Kirke.[1]

## The Rosa.

*(District Court, E. D. New York.   March 9. 1385*

*(Circuit Court, E. D. New York.   July 15, 1885.)*

1. CARRIERS OF PASSENGERS—STEAM-BOATS—PENALTY FOR CARRYING MORE PASSENGERS THAN ALLOWED BY INSPECTION CERTIFICATE—REV. ST. §§ 4465, 4469 —INTERSTATE COMMERCE.

   A steam-boat employed by a railroad company to transport passengers on Jamaica bay, Long Island, (which is an inlet of the Atlantic ocean entirely within the state of New York,) in connection with a railroad forming a part of the railroad system of the whole country, is engaged in interstate commerce to an extent sufficient to bring her within the provisions of sections 4465, 4469, of the Revised Statutes, prescribing penalties for steamers carrying more passengers than allowed by their certificates of inspection.

2. SAME—EFFECT OF POSSESSION OF INSPECTION CERTIFICATE.

   The application for and use of the certificate of inspection, required by another section of the same statute here sought to be enforced against such a steam-boat, is sufficient to require the conclusion that the steam-boat is subject to such provisions of statute, and liable for a violation of them.

3. SAME—PUBLIC NAVIGABLE WATERS—JAMAICA BAY—CONSTITUTIONAL LAW.

   The waters of Jamaica bay, New York, are public navigable waters of the United States, within the meaning of section 4400 of the Revised Statutes. Such waters are under the direct control of congress in the exercise of the constitutional power to regulate interstate and foreign commerce; and the statute forbidding the transportation on a steam-boat of passengers in excess of her capacity, is a regulation calculated to promote convenient and safe navigation on such waters, and is applicable to all vessels navigating such waters, although it is not shown that they were engaged in transporting passengers or freight between places outside the state of New York, and places within that state.

4. SAME—FERRY-BOAT—SECTION 4464.

   Such a steam-boat, having obtained a certificate as a general passenger boat, and not as a ferry-boat, does not come within the exception in section 4464.

In Admiralty.

*Henry G. Atwater,* for libelant, Robert Elliott, in both cases.

*H. W. Johnson,* for claimant, in both cases.

BENEDICT, J.   This is a proceeding in admiralty to enforce a lien upon the steam-boat Hazel Kirke, for certain penalties alleged to have been incurred by reason of the taking on board said vessel a greater number of passengers than allowed by her certificate of inspection. The libelant, Robert Elliott, seeks to recover these penalties by virtue of sections 4465 and 4469 of the Revised Statutes of the United States, which are as follows:

"Sec. 4465. It shall not be lawful to take on board of any steamer a greater number of passengers than is stated in the certificate of inspection; and for every violation of this provision the master or owner shall be liable, to any person suing for the same, to forfeit the amount of passage money and ten dollars for each passenger beyond the number allowed."

"Sec. 4469. The penalties imposed by sections 4465 and 4468 shall be a lien upon the vessel in each case.   *   *   *"

[1] Reported by R. D. & Wyllys Benedict, Esqs., of the New York bar.

At the time of taking these passengers the Hazel Kirke was employed by the Brooklyn & Rockaway Beach Railroad Company, a corporation organized under the laws of the state of New York for the purpose of constructing, operating, and maintaining a railroad for the conveyance of passengers and property over a route commencing at or near the easterly termination of the route of the Broadway Railroad Company, in the village of East New York, and terminating at or near the channel of Jamaica bay, in the vicinity of Canarsie point. This corporation, by a statute passed April 12, 1864, was empowered to establish a ferry across Jamaica bay, and receive compensation for the conveyance of freight and passengers between the termination of their railroad, at or near the village of Canarsie, on said bay, and any point or points on Rockaway beach; and for that purpose to purchase, build, or have and use such steam-boats or other vessels and facilities as might be necessary in the operation of said ferry. By the same statute the said corporation was empowered to construct and operate an additional line of railroad to run in connection with said ferry between the termination thereof on Rockaway beach and such point or points at or east of Far Rockaway as the directors of the corporation might designate.

In pursuance of these statutes the said corporation was in June and July, 1883, engaged in transporting passengers and freight between East New York and Far Rockaway, by means of a railroad running between East New York and Canarsie, by means of steamboats plying upon Jamaica bay, and by means of a railroad running between Rockaway beach and Far Rockaway. For the purpose of such transportation the said corporation used the steam-boat Hazel Kirke to carry freight and passengers between Canarsie and various piers, four or five in number, which put out from Rockaway beach into Jamaica bay. The boat made five or six trips a day, stopping at one place in the bay between Canarsie and Rockaway beach, each trip requiring some two and a half hours of time. Rockaway beach is a place of summer resort upon the ocean. On one such trip made by this boat on June 24, 1883, there were taken on board and transported 289 passengers; on another such trip, made on the same day, 365 passengers were taken on board and transported in said steam-boat. On another such trip, made July 1, 1883, 375 passengers were taken on board and transported on said boat.

At the time those passengers were so transported, the Hazel Kirke was running under a certificate of inspection granted May 24, 1883, on the application of her master pursuant to the provisions of title 52 of the Revised Statutes of the United States, which certificate states that the said steam-boat "is permitted to navigate for one year the waters between Canarsie bay and Rockaway, Long Island," and "is allowed to carry 250 passengers." Because of the transportation on the trips above mentioned of the above number of passengers, being 279 in excess of the number allowed by her certificate of inspec-

tion, the libelant, by virtue of the sections of statute above quoted, seeks to enforce a lien upon the steam-boat for the sum of $2,803.95, being $10.05 fare for each passenger in excess of 250 carried on any of said trips.

No serious contest has been made in respect to the facts; but the liability of the steam-boat is denied, and it has been earnestly contended that the provisions of statute upon which this prosecution rests are not applicable to this steam-boat—*First*, because she was not engaged in interstate or foreign commerce; *second*, because she was a ferry-boat.

The first matter of inquiry presented by this defense is whether, upon the evidence in this case, this steam-boat, when she transported these passengers, was engaged in purely internal commerce. Certainly it does not follow that she was so engaged, from the fact that all the places at which the vessel touched were in the state of New York. It is entirely possible for a vessel to be engaged in interstate commerce, although all the ports touched by her are in the same state; and my opinion is that, in the absence of evidence to the contrary, it is to be inferred from the route pursued by the boat, the connection between the boat and a railroad at each end of her route, the manifest connection between the railroad terminating at East New York and the railroad system of the United States, that this boat was, to some extent at least,—to what extent is immaterial,—engaged in interstate commerce. She was used to enable the public to reach a well-known summer resort at the sea-shore, and her occupation affords assurance that, as matter of fact, she was used as an instrument for the transportation of passengers traveling between places out of the state of New York and places upon the sea within that state.

If, then, the inference above suggested be permissible, and it be found that the vessel was engaged in interstate commerce, the conclusion must follow that the provisions of statute above quoted were applicable to her, and that she, by virtue of these provisions, is subject to the lien sought to be enforced by this proceeding.

But it has been contended here that such an inference is not permissible in a case of this character, and I therefore proceed to state some considerations which, as I conceive, compel a conclusion by this court that this boat is subject to the provisions of statute here sought to be enforced against her. And, first, I observe that the foundation of this proceeding is the violation of a certificate of inspection which had been granted to this vessel by virtue of the very statute now claimed to be inapplicable to her. When these passengers were carried the vessel was running under this certificate, by which a limit to the number of passengers she could legally carry was fixed, and this certificate had been issued upon the application of the master of the boat. This certificate was posted in a conspicuous place on the boat, and the boat was thus held out to the public as a vessel subject to, and which had complied with, the statutes of the United States un-

der consideration, and by virtue of those laws had been approved by the inspectors as a general passenger boat. The owner, having sought and obtained for his boat the advantages afforded to vessels authorized under the laws of the United States to navigate the public waters of the United States, and having held his vessel out to the public as a vessel subject to, and navigating under, the statute in question, cannot now be permitted to say that the statute has no application in her case. The certificate of inspection required by the laws of the United States to be exhibited in a conspicuous place upon every vessel inspected under the laws of the United States, would be a vain thing if its validity depends upon the character of the employment in which the owner may see fit to engage the boat. This application for, and use of, the certificate of inspection for this boat is sufficient, in my opinion, to require the conclusion that the vessel is subject to the provisions of statute sought to be enforced against her, and liable for a violation thereof.

The same conclusion is required by the other facts in the case, when to them is applied the law declared by decisions of the supreme court of the United States in cases to be now alluded to; for, according to these decisions, the provisions of statute upon which this prosecution is founded are applicable to this vessel, although it be found not proven that she was engaged in transporting passengers or freight passing between places outside of the state of New York and places within that state.

Here the inquiry, it will be noticed, is not whether this court, sitting in admiralty, has power to enforce a lien arising out of a transportation of passengers upon navigable waters of the United States. The power of the court in such a case is derived from the judicial grant of the constitution, in connection with the statute creating the district courts, enacted by virtue of that grant. Touching the jurisdiction of this court to enforce such a lien, if one be found to exist upon this vessel, no point is made. The question here relates, not to the jurisdiction of the court, but to the power of congress to create a lien upon this vessel, by reason of an act done when the vessel, although navigating navigable waters of the United States, is not shown to have carried passengers or goods moving from one state to another.

Such a power has been considered to have been conferred upon congress by the judicial grant, (*U. S.* v. *Burlington & Henderson Co. Ferry Co.*, 21 Fed. Rep. 332;) and, the grant of admiralty and maritime jurisdiction having been declared by the supreme court of the United States not to be limited by the commercial grant, (*The Belfast*, 7 Wall. 642,) it may be that when the transaction is declared by the judicial power to be within the admiralty and maritime jurisdiction of the United States, the power to make such a transaction the foundation of a lien, enforceable by courts having jurisdiction of all cases of admiralty and maritime jurisdiction, can be exercised by congress as incident to the power to create such courts. But the question

whether an act done upon navigable waters of the United States, and so within the admiralty and maritime jurisdiction conferred upon the United States by the judicial grant of the constitution, may, by the legislative body authorized by the constitution to create courts of admiralty, be made the foundation of a lien, enforceable in such courts, is a question that does not appear to require discussion on this occasion. Resort to the judicial grant for power to subject this vessel to the provisions of statute under consideration is rendered unnecessary by the decisions of the supreme court of the United States in the case of *The Daniel Ball*, 10 Wall. 557, and the case of *The Montello*, 20 Wall. 430. These decisions declare the law to be that the commercial grant of the constitution, limited although it is to commerce with foreign nations, among the several states, and with the Indian tribes, confers upon congress power to subject every vessel transporting passengers upon the navigable waters of the United States to the governmental control of the United States, whether such vessel be engaged in transporting persons traveling strictly between ports in the same state, or travelers moving from one state to another. In the case of *The Montello*, provisions of statute similar in character to those under consideration here, were considered and held applicable to a steam-boat navigating the Fox river, for the sole reason that the Fox river was public water of the United States within the definition of such water given in the case of *The Daniel Ball*. The opinion delivered in that case makes no allusion to the employment in which the vessel was engaged upon the Fox river; but the question whether the Fox river was public water of the United States is considered with care, and upon the conclusion that the Fox river was public water of the United States, and upon that conclusion alone, the court bases its declaration that "steam-boats navigating the Fox river are subject to governmental regulation."

It may be said in regard to this decision that facts are stated in the opinion of the court justifying the inference that the vessel was engaged in interstate commerce; but the opinion makes no allusion to such an inference. The case contains no decision that the vessel was engaged in interstate commerce; and the vessel was held liable upon the sole ground that she was navigating public waters of the United States. The decision of the supreme court in the case of *The Montello*, therefore, seems to furnish authority for limiting the inquiry in this case to the question whether the Hazel Kirke was navigating public waters of the United States when she transported the passengers in question. If that be the limit of inquiry here, the decision is easy; for the Hazel Kirke was navigating Jamaica bay,—an inlet of the Atlantic ocean,—which forms a continuous highway for commerce upon navigable water, both with foreign nations and among the several states. She was, therefore, transporting these passengers upon public water of the United States, and, according to the decision in the case of *The Montello*, was subject to governmental control. The

case of *The Daniel Ball*, decided prior to the case of *The Montello*, points to the same conclusion; for in that case, to the suggestion that the position asserted in the decision gives congress the entire control of the commerce of the country, the court answers: "The present case relates to transportation on the navigable waters of the United States." To the same effect is language used by the chief justice in delivering the opinion of the court in the case of *Lord* v. *Steamship Co.*, 102 U. S. 541, a case decided subsequent to the case of *The Montello*. There the court says, (page 544:)

"She was navigating among the vessels of other nations. * * * True, she was not trading with them, but she was navigating with them, and consequently with them was engaged in commerce."

That is to say, although not engaged in the same trade with the foreign vessels navigating the same ocean, the vessel was navigating with them upon a highway of commerce between nations, and therefore engaged with them in the commerce there pursued. That was a case of the application of a statute of the United States to a vessel navigating the high seas, but engaged only in the transportation of goods and passengers moving between ports and places in the same state.

In view of these decisions I find it difficult to understand the positive assertion in behalf of the claimant that the law, as declared by the supreme court of the United States, forbids the application of the statute under consideration to this vessel unless it appears that she was engaged in transporting goods or passengers moving from one state to another state, or to some foreign port.

In this connection it may be well to observe that the statute under consideration was passed subsequent to the decision of the supreme court in the case of *The Daniel Ball*, and its terms show that the power to subject vessels to such a statute was supposed by congress to depend upon the character of the navigation in which the vessel was engaged, and that congress intended to subject to governmental control all vessels navigating the public waters of the United States; for the statute in section 4400 declares that "all steam-vessels navigating any waters of the United States which are common highways of commerce, or open to general or competitive navigation, * * * shall be subject to the provisions of this title."

But if these decisions permit a wider scope of inquiry than that above indicated, still the decision in the case of *The Daniel Ball* is an authority adverse to the contention of the claimant here. In that case the act charged was done in a locality similar in its aspects to Jamaica bay. The decision in that case, therefore, compels a decision in this case that the waters of Jamaica bay are under the direct control of congress in the exercise of the power conferred by the commercial grant. That decision also declares that the commercial grant authorizes all legislation by congress appropriate for the protection or advancement of interstate or foreign commerce upon such waters;

and, further, that all legislation calculated to insure the convenient and safe navigation of such waters is legislation appropriate for the protection of the interstate or foreign commerce pursued, or which may be pursued, upon such waters. The language of the court is:

"That power [the commercial power] authorizes all appropriate legislation for the protection or advancement of either interstate or foreign commerce, and for that purpose such legislation as will insure the convenient and safe navigation of all the navigable waters of the United States."

Manifestly it is not possible for congress to fully control and adequately protect commerce with foreign nations and among the several states, when that commerce is pursued by means of vessels navigating the public waters of the United States, without controlling the navigation of all vessels navigating such waters, not only those engaged in commerce with foreign nations, and among the several states, but those engaged in domestic commerce, and those engaged in no commerce at all, like the yachts. Accordingly congress has undertaken to regulate the lights to be carried by all vessels navigating such waters, and the courses to be pursued by all vessels meeting upon such waters, and these regulations are supreme and binding upon all vessels there navigating, because only by controlling in those particulars the navigation of all vessels navigating such waters, can the safe navigation of vessels engaged in interstate or foreign commerce upon such waters be secured.

Under this view of the law, declared by the supreme court in the case of *The Daniel Ball*, the decision of this case must depend upon the questions—*First*, whether the Hazel Kirke was engaged in navigating public waters of the United States; and, *second*, if so, whether the provision of statute which she has violated is a provision calculated to promote the convenient and safe navigation of such waters. Both these questions must be answered in the affirmative. The first does not admit of discussion; the second is free from doubt.

The object and effect of a provision forbidding the transportation upon a steam-boat of passengers in excess of her capacity is plain. It is a regulation respecting the load to be carried by the vessel, and it will hardly be contended, I think, that the navigation of a vessel is not directly affected by the amount of her load. No doubt one effect of a regulation, confined as this one is to the number of passengers to be taken on board a vessel, is to promote the safety of passengers by insuring the safe navigation of the boat in which they are carried. But the safe navigation of other boats is, or may be, also directly affected by such a regulation. The ability of a vessel to stop, to turn, to give room in shallow water, depends, or may depend, upon her load; and her ability in these respects affects, not only the safety of her passengers, but the safety of passengers on other vessels navigating in the same locality. The ability of a vessel to navigate any water depends upon the capacity to navigate possessed by other vessels on

the same water.   Upon many navigable waters of the United States
the incapacity of a vessel, by reason of her load, to give room required
for passing would, for the time being, obstruct all commerce of any
kind upon such waters.   It seems impossible, therefore, to deny that
the regulation under consideration is a regulation calculated to pro-
mote the convenient and safe navigation of the public waters of the
United States.   This being so, the regulation, according to the decis-
ion of the supreme court in the case of *The Daniel Ball,* is one which
the congress of the United States, by virtue of the grant of commer-
cial power contained in the constitution, is competent to make ap-
plicable to all vessels navigating the public waters of the United
States, including Jamaica bay.

I have thus endeavored to show that the first ground of defense,
based upon the character of the travel for which this vessel was used
at the time of transporting these passengers, is untenable.   I now
pass to the second ground of defense, namely, that the Hazel Kirke
was a ferry-boat.   Here the contention is, not that it is beyond the
power of congress to prescribe regulations for vessels used in oper-
ating a ferry, but that, inasmuch as ferry-boats are by the express
terms of the statute under consideration exempted from the opera-
tion of section 4465, this boat has incurred no liability under that
section, because she was a ferry-boat.   Section 4464 provides as fol-
lows:

"The inspectors shall state in every certificate of inspection granted to
steamers carrying passengers, other than ferry-boats, the number of passen-
gers of each class that any such steamer has accommodations for, and can
carry with prudence and safety."

And the question is whether, assuming that this boat was being
used to maintain a ferry across Jamaica bay, the boat is therefore
exempt from prosecution for violating in the matter of the number
of her passengers the certificate of inspection under which she sailed.
Here, again, my opinion is adverse to the claimant.   The statute,
by its terms, is applicable to "all steam-boats navigating any waters
of the United States which are common highways of commerce, or
open to general or competitive navigation, excepting public vessels of
the United States, vessels of other countries, and boats propelled in
whole or in part by steam for navigating canals," and certain various
regulations made by express words applicable to ferry-boats.   It con-
templates a separation of steam-boats engaged in carrying passengers
into two classes for the purpose of inspection and approval.   For ferry-
boats a special inspection is provided by section 4426, and by regulation
72 a special certificate designating the ferry route to which the navi-
gation of the boat is to be confined.   For general passenger boats
inspection is provided by section 4464.   Steam-boats of the latter
class, when inspected, are to be inspected as to their capacity to trans-
port safely a certain number of passengers, and to that number of

passengers the boat must be limited by her certificate. Steam-boats of the former class are by section 4426 required to be inspected as other steam-boats; but are required, in addition, to comply with such provisions for the better security of life as the board of supervising inspectors may, by regulation, require; and the inspection of a boat of that class is touching her capacity to carry all the passengers that may be expected to pass by a given ferry route to be named in the certificate. When so inspected and approved, a certificate is granted to a ferry-boat, which limits her to a certain ferry, but which has no effect to limit the number of passengers which the boat can lawfully carry over such ferry. Whether, therefore, a boat is a general passenger-boat, authorized to carry passengers up to a certain limit, or is a ferry-boat, authorized to carry an unlimited number of passengers upon a certain ferry, depends upon the character of the inspection applied for by the owner, and the certificate granted upon such application.

In the present instance, the master of the Hazel Kirke made application under the laws of the United States to have his vessel inspected and approved as a general passenger boat. Upon such application she was inspected and approved, and a certificate granted by which she was permitted to navigate the waters between Canarsie bay and Rockaway, and allowed to carry 250 passengers, and no more. By this application and consequent certificate, the character of the boat was fixed as a general passenger boat, allowed to carry 250 passengers. Whether the route which this vessel followed constituted a ferry, in the legal sense, is a question upon which no opinion is expressed; but assuming that it was a ferry, my opinion is that the boat could not legally transport a greater number of passengers than she was allowed to transport by the certificate of inspection she carried. She did not become a ferry-boat within the meaning of the statute merely by running upon a ferry route, but was a general passenger boat, subject to the limitation in the matter of her passengers which she had sought for herself and obtained when, upon the application of her master, she was inspected and approved as a general passenger boat, and not as a ferry-boat upon a particular ferry.

It follows from these views that a decree be entered in favor of the libelant for the sum of $2,803.95. The costs will follow the decree.

---

An action was also brought by the same libelant, Robert Elliott, against the steam-boat Rosa, to recover a similar penalty. The following is the opinion of the district court:

BENEDICT, J. The facts in this case are similar to the facts in the case of the Hazel Kirke, except in respect to the number of passengers. The cases were tried together. In this case the excess in

number of the passengers carried was 123, and the decree must be for $1,236.15 and costs.

---

The decisions of the district court in these cases, on appeal to the circuit court, were affirmed on July 15, 1885, the court delivering the following opinion:

BLATCHFORD, Justice. I concur with the district judge in holding that the sections of the Revised Statutes on which these suits are founded apply to these vessels, although it is not shown that they were engaged in transporting passengers or freight passing between places outside the state of New York and places within that state. They were at the time engaged in carrying passengers on the waters of Jamaica bay, which were public navigable waters of the United States, because they were open to the Atlantic ocean, and were thus a highway over which commerce might be carried on with other states and foreign countries. They were such waters as section 4400 embraces. Congress undertook to assert its power of regulating vessels navigating such waters, and, under the grant of the power of regulating such commerce, it could prescribe what number of passengers vessels navigating Jamaica bay should carry.

I also concur with the district judge in the view that, as these vessels obtained certificates of inspection as general passenger boats, and not as ferry-boats, their character was thereby fixed; and their use on a ferry, if this transit was a ferry, did not make them ferry-boats, *quoad* the statute, or bring them within the exception in section 4464, or free them from the penalties imposed by section 4465.

In the case of *The Hazel Kirke* there must be a decree for the libelant for $2,803.95, and his costs in the district court, taxed at $58.05, and his costs in this court to be taxed; and in the case of *The Rosa* there must be a decree for the libelant for $1,236.15, and his costs in the district court, taxed at $58.05, and his costs in this court to be taxed.