## THE CITY OF SALEM.

*(District Court, D. Oregon. February 12, 1889.)*

1. NAVIGABLE WATERS—INTERSTATE REGULATIONS.

    The power to regulate commerce among the several states comprehends the power to regulate the navigable waters of the United States on which such commerce may be or is carried, and to this end congress may make any regulation concerning such navigation, including the vessels engaged therein, as may be necessary and proper to secure and maintain the safety and convenience of the water-way; which regulations are so far applicable to vessels engaged only in intrastate commerce thereon as to those engaged in interstate commerce.

2. SAME—CARRIERS OF PASSENGERS.

    The regulation contained in section 4465 of the Revised Statutes, forbidding a steam-boat to carry more passengers than allowed in her certificate of inspection, *held* to apply to such boats engaged in carrying passengers on a navigable water of the United States between ports of the same state only.

*(Syllabus by the Court.)*

At Law.
*W. Scott Beebe*, for libelant.
*Charles J. Macdougall*, for owner and claimant.

DEADY, J. This suit is brought by the libelant, A. F. Reed, against the steam-boat City of Salem and Robert Thompson, her owner, to recover sundry penalties for carrying more passengers than is allowed by the vessel's certificate of inspection.

An exception is filed to the libel, to the effect that the transportation of passengers in question was wholly within the state, and is therefore not within the grant of power to congress to regulate commerce nor the jurisdiction of this court.

Section 4399 of the Revised Statutes declares: "Every vessel propelled in whole or in part by steam shall be deemed a steam-vessel within the meaning of this title," (52;) and section 4400 of the same provides: "All steam-vessels navigating any of the waters of the United States which are common highways of commerce, or open to general, or competitive navigation, excepting public vessels of the United States, vessels of other countries, and boats    *    *    *    for navigating canals, shall be subject to the provisions of this title" (52.)

It is also provided in this title that there shall be an inspector of hulls, and one of boilers, in each district, who shall inspect all steam-vessels, and when they "approve a vessel and her equipment" they shall make a certificate to the collector to that effect. Section 4421, Rev. St.

In case of a steamer "carrying passengers, other than ferry-boats, the number of passengers of each class that any such steamer has accommodation for and can carry with prudence and safety" shall be stated in said certificate, (section 4466, Id.;) and, if any steamer shall "take on board" any more passengers than the number stated in the certificate of inspection, the owner shall be liable to any person who may sue for the same in the penalty of $10 for each such passenger, (section 4465, Id.,) and such penalties shall be a lien on the vessel. (Section 4469, Id.)

It appears from the libel that on July 4, 1888, the City of Salem was a vessel wholly propelled by steam, and engaged in navigating the Wallamet river, and was duly enrolled and licensed therefor; that by her certificate of inspection she was only entitled to carry 60 passengers; that on said day said vessel was engaged in carrying passengers from the port of Portland to other points and places on said river, and within this district, and did on four such trips carry, in the aggregate, 2910 more passengers than allowed by her certificate.

The precise question raised in this case has never been passed on by the supreme court. In the district courts there have been apparently conflicting decisions on the point.

In *The Gretna Green*, 20 Fed. Rep. 901, it was held that a steam-boat "regularly enrolled and licensed" for the navigation of the Ohio river, "and subject to the laws of congress," was not liable under section 4492 of the Revised Statutes for carrying passengers in barges in tow, the same not being equipped as prescribed by the supervising inspectors, between

different ports of the same state. But the opinion leaves it in doubt whether the steam-boat would be liable for carrying passengers on her own decks between the same points, contrary to the laws of the United States on the subject.

After substantially admitting that congress has the power to prescribe the law of the highway, so far as may be necessary to protect interstate commerce, the court says:

"The steamer which had these barges in tow being subject to the navigation laws of the United States, the mere fact that she took in tow the barges had nothing to do with any interference with the proper navigation of the Ohio river."

In *U. S.* v. *Ferry Co.*, 21 Fed. Rep. 331, it was held that the owners of the vessel engaged in navigating the waters of the Mississippi, carrying passengers between two ports in the state of Iowa, in excess of the number authorized by a permit issued under section 4466 of the Revised Statutes, are liable for the penalties prescribed in section 4500 of the same.

The court held that congress has power to regulate the navigation of vessels on the navigable waters of the United States, when engaged exclusively in interstate commerce, and that when a steam ferry-boat, contrary to section 4466 of the Revised Statutes, carries passengers between ports of the same state, in excess of the number allowed in her permit, she is guilty of a marine tort, and a district court of the United States has jurisdiction of a suit in admiralty against her owners to recover the penalty prescribed by section 4500 of the Revised Statutes for the same.

In *The Seneca*, 1 Biss. 371, it was held that a steam-boat employed in carrying passengers between two ports of the state of Wisconsin was not liable to a penalty for not having her hull and boilers inspected under the steam-boat act of 1852.

In the case of *The Oyster Police Steamers of Maryland*, 31 Fed. Rep. 763, it was held that three steam-vessels belonging to the state of Maryland, not engaged in carrying freight or passengers, but used to enforce the state fishery laws in the Chesapeake bay, are liable to the penalties prescribed by section 4499 of the Revised Statutes, for failing to have their hulls and boilers inspected by the United States inspectors, under sections 4417 and 4418 of the Revised Statutes.

The court held that the "supreme and exclusive control" of congress of the navigable waters of the United States "might be defeated or rendered less effective for its objects if there were to be recognized a class of vessels privileged to use them, without being subject to those provisions which congress determines are required for the safety of all. I am therefore unable to assent to the contention that the fact that the vessels in the present case are not used in commerce, but solely for the police purposes of the fishery force, prevents congress from having the constitutional power to legislate with regard to them. It is not their use, but the fact that they navigate the highways of commerce, which brings them within the constitutional grant of power, and within the language of section 4400 of the act of congress."

In *Lord* v. *Steam-Ship Co.*, 102 U. S. 541, it was held by the supreme court, in the language of the syllabus, that "while navigating the high seas, between ports of the same state, a vessel of the United States is, together with the business in which she is engaged, subject to the regulative power of congress."

Mr. Chief Justice WAITE, in speaking for the court said, in substance, that the Ventura, while navigating the Pacific ocean, although bound from and to ports in the state of California, was without the state, and on a highway of nations, and therefore "engaged in commerce with foreign nations, and as such she and the business in which she was engaged were subject to the regulating power of congress."

This case falls within the language of the statute (sections 4399, 4400, Rev. St.) defining what vessels shall be subject to the provisions of title 52.

The City of Salem is a vessel propelled by steam. On the occasion in question she was navigating the Wallamet river, a navigable water of the United States, (*Hatch* v. *Bridge Co.*, 7 Sawy. 136, 6 Fed. Rep. 326; *Bridge Co.* v. *Hatch*, 9 Sawy. 648, 19 Fed. Rep. 347,) which "is a common highway of commerce, and open to general and competitive navigation."

Unless the act of congress, so far as the carriage of the passengers in question is concerned, is unconstitutional, the vessel is liable for the penalties prescribed for carrying more passengers than the law allows.

In my judgment, the solution of this question depends wholly on whether the regulation limiting the number of passengers which a steam-boat may carry over a navigable water of the United States, between ports of the same state, is necessary to maintain this highway of foreign and interstate commerce in a safe and desirable condition for the use of vessels and persons engaged in the same.

The power to make this regulation cannot, in my judgment, be derived from the grant of admiralty jurisdiction. The admiralty jurisdiction of the United States is a part of its judicial power, and not its legislative. It extends "to all cases of admiralty and maritime jurisdiction." Const. U. S. art. 3, § 2. And while it does not authorize congress to create admiralty cases, yet, if in the exercise of its power derived from other clauses of the constitution, it should do so, as the power to regulate commerce, the grant of judicial power would extend to them, and include them, because in their nature and constituents they would be cases of admiralty and maritime jurisdiction.

Take this case as an illustration. The City of Salem is alleged to have violated a law of the United States, to which a penalty is affixed, and made a lien on the vessel. The act was committed on a navigable water of the United States, and the admiralty has jurisdiction of the case, to hear and determine it. But if congress had not the power to pass the law in question the suit must fail, because no wrong was in fact committed.

The power to make this regulation must be derived, if at all, from the power granted to congress "to regulate commerce with foreign nations, and among the several states." Id. art. 1, § 8.

v.37F.no.15—54

In *Gilman* v. *Philadelphia*, 3 Wall. 724, Mr. Justice SWAYNE, speaking for the court, said:

"The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all navigable waters of the United States which are accessible from a state other than those in which they lie. For this purpose they are the public property of the nation, and subject to all the requisite legislation of congress."

And in the case of *The Daniel Ball*, 10 Wall. 564, Mr. Justice FIELD, speaking for the court, said: ·

"The power to regulate commerce authorizes appropriate legislation for the protection of either interstate or foreign commerce, and for that purpose such legislation as will insure the convenient or safe navigation of all navigable waters of the United States, whether that legislation consists in regulating the removal of obstructions to their use, in prescribing the form and size of vessels employed upon them, or in subjecting the vessels to inspection and license in order to insure their proper construction and equipment."

That in the case of steam-boats, the inspections of their hulls and boilers, the licensing of their pilots and engineers, the carrying of prescribed lights, and the giving and answering of prearranged signals when meeting and passing, do materially increase the safety and convenience of navigable water, considered as a highway of commerce, there is no doubt, and therefore there is no question that congress may make regulations on these subjects, which are applicable to vessels engaged in intrastate commerce as well as foreign or interstate commerce.

The power to regulate the navigation of the waters of the United States being comprehended in the grant of power to regulate commerce, not merely as an incident, but a part of it, congress has power "to make all laws which shall be necessary and proper for carrying into execution" such power. Const. U. S. art. 1, § 8.

In *McCulloch* v. *Maryland*, 4 Wheat. 421, Chief Justice MARSHALL said:

"Let the end be legitimate,—let it be within the scope of the constitution, —and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

And again, (Id. 423:)

·"But where the law is not prohibited, and is really calculated to effect any of the objects intrusted to the government, to undertake here to inquire into the degree of its necessity would be to pass the line which circumscribes the judicial department, and to tread on legislative ground."

Upon this exposition of the law is this regulation limiting the right of steam-boats to carry passengers on a navigable water of the United States to the number prescribed by the certificate of inspection of the local inspectors, a necessary and proper regulation of navigation, when such boat is engaged in carrying passengers on such water between different ports of the same state only?

That it is so, is at least not so apparent as in the instances mentioned, in which it appears there is no doubt on the subject.

In what particular a boat carrying more passengers than allowed by

her certificate of inspection or special permit affects the safety or convenience of the highway has not been suggested by counsel. That the passengers so carried are inconvenienced, and, it may be, endangered, is likely. But the question is, how is the safety and convenience of the highway thereby unfavorably affected as to other vessels engaged in interstate or foreign commerce thereon? If it was shown that an overloaded boat was more difficult to handle, or more likely to become unmanageable or burst her boiler or steam-chest, the danger resulting to other vessels on the highway would be apparent. But there is no proof on this subject, and I am not satisfied that it is within the limits of judicial knowledge.

One thing is probable. If a steam-boat is allowed to carry passengers between the ports of any state over the navigable waters of the United States, in excess of the number prescribed in its certificate of inspection, the boats running between said ports, and from or beyond, to ports of another state, will be compelled to do the same thing, or substantially abandon what may be called their "way business;" for any one can understand that a vessel can carry 200 passengers much cheaper per head than another one of the same character and dimensions can carry half the number for. The result would be to nullify the regulation, or make its enforcement difficult in cases where it is admitted to be legal and presumably beneficial.

It may be said that, when it is determined that the carrying of passengers between different ports of the same state is not within the power of congress to regulate, the state will make proper regulations on the subject. But it is not probable that any state regulation on this subject would be either effective or well enforced.

Congress has expressly declared (sections 4399, 4400, Rev. St.) that this regulation shall apply to steam-boats carrying passengers over any part of a navigable water of the United States. The regulation, when applied to the carriage of passengers between ports of the same state, is a beneficial one, and its enforcement tends to the safety of human life. Without it, the excursion boats, which on festive occasions ply between ports of the same state, would often become floating coffins.

If this regulation, as applied to vessels engaged in intrastate commerce, is really calculated to promote the safety and convenience of interstate and foreign commerce in any appreciable degree, the enactment of it is within the discretion of congress. And while I am not as clear in my mind, on this point, as I would like to be, I have an impression that I feel more certainly than I can express, that the regulation in its effect and operation does materially tend to maintain the safety and convenience of this highway of interstate and foreign commerce,—the Wallamet river.

On this view of the matter I do not feel warranted, sitting here in the district court, in declaring this act of congress unconstitutional. It is a proper case to go to the supreme court.

The exception is disallowed.