PEOPLE ex rel. PENNSYLVANIA R. CO. v. KNIGHT, Comptroller.

(Supreme Court, Appellate Division, Third Department. December 31, 1901.)

TAXATION—INTERSTATE COMMERCE.

    A railroad company, engaged in interstate commerce, which maintains a cab service at a ferry station in a city for the conveyance of passengers between the station and any part of the city, is subject, under Tax Law, §§ 182–184, to taxation on such business, it not being interstate commerce, nor necessarily connected therewith.

Certiorari by the people, on the relation of the Pennsylvania Railroad Company, against Erastus C. Knight, as comptroller of the state of New York, to review the decision of the comptroller assessing a tax upon the relator under the alleged authority of the tax law of the state. Determination of comptroller confirmed.

Argued before PARKER, P. J., and EDWARDS, SMITH, CHASE, and HOUGHTON, JJ.

Lee Everett and Henry Galbraith Ward, for relator.
Henry B. Comen, Dep. Atty. Gen., for defendant.

CHASE, J.  The relator is a foreign corporation engaged in carrying freight and passengers in Pennsylvania, New Jersey, and other states.  It is a common carrier of passengers to and from New York City.  Its terminus in New Jersey is Jersey City, from whence it conveys its New York passengers, by ferryboats operated by it, to and from its station at Twenty-Third street, North river, and other points in New York.  Its terminus in New York City is such ferry stations.  In the year 1897 it established a cab stand on its premises at said Twenty-Third Street Ferry Station, and it has since continuously maintained a cab service to and from such station.  It issues and distributes to the public a circular containing a list of cab charges and rules for the conduct of its drivers, and also statements as follows:

"An agent of the cab service will be found at the cab stand, who will see that all orders for vehicles are promptly filled, and that patrons are courteously and satisfactorily served."  "Orders by telephone from persons desiring cabs or omnibuses to carry them to the Twenty-Third Street Station will receive prompt attention."  "These vehicles are intended for the use of persons going from or to the Twenty-Third Street Station of the Pennsylvania Railroad."

In 1890, no tax having theretofore been collected upon such cab service, the comptroller applied to the relator for a statement of the gross receipts and expenses of said service since it was started, and also for the value of the horses and vehicles employed and the real estate used in said service.  The relator complied with said request, and the comptroller, on the 1st day of December, 1900, stated and fixed a tax of $934.07 to be paid by the relator upon its gross earnings in said cab service during the four years ending October 31, 1900, and $1,422.54 computed upon the basis of its capital so employed within this state for said period.  The relator applied to the comptroller to revise and readjust such account, and after a hearing thereon the comptroller refused to make any revision or readjustment of said account for taxes.  On the application for a revision and readjustment of said account for taxes the relator conceded that no part of the receipts from its cab service is received as compensation for any service outside of the state of New York, and stated that it based its right to exemption solely upon the ground that the service is part of and incidental to its interstate commerce.  In the relator's petition herein it says:

"It is true that the charge for cabs is separate from the charge for the balance of the passenger's transportation, but this is necessary from the nature of things.  It would be impossible for your petitioner to include in its railroad and ferry tickets the price of the cab service—First, because, as the price would vary in amount in every case according to the distance the passenger is carried, an infinity of tickets would have to be provided; and, second, because passengers buying railroad tickets to New York do not know whether they will employ a cab or not."

The tax is not on the property of the relator, but upon its privilege of exercising its corporate franchises or carrying on its business in its corporate or organized capacity in this state.  Tax Law, §§ 182–184; People v. Wemple, 138 N. Y. 1, 33 N. E. 720, 19 L. R. A.

694. Such tax cannot be imposed upon a business consisting wholly of interstate commerce. People v. Wemple, supra. All contracts for cab service with the relator are made, and the journey, so far as such contracts are concerned, is commenced and ended, in this state. The situs of the property used in such service is in this state. A person making an interstate journey to New York by contract with the relator buys a ticket to New York only, and the relator's contract is fulfilled when the passenger is safely carried to one of the relator's ferry stations in New York. If it happens that the passenger is carried to New York on a Twenty-Third street ferry, he may, if he chooses, after his arrival, employ a cab of the relator to take him to any part of the city where fancy or business may call him. He cannot, if he would, contract for such cab service before he arrives in this state. In the language of the relator's petition, we say that the relator could not make the cab service a part of the original contract "because passengers buying tickets to New York do not know whether they will employ a cab or not." If a person at some point within the city of New York calls one of the relator's cabs to carry him to the Twenty-Third Street Station, he may do so for the purpose of meeting a friend on his arrival in New York, or he may do so in contemplation of an interstate journey, and then, before taking the ferry, change his mind, and return to his starting point by cab or otherwise. The cab service would seem to be wholly independent of and disconnected from the interstate journey as much as the streets and elevated roads upon which many of the relator's passengers doubtless immediately go from the ferry station to some interior point in the city. The relator's serious difficulty in making the interstate journey continue to some interior point in the city is not so much one relating to the tickets as it is that the passengers want the interstate journey to end at the ferry station, and then leave their further movements to depend upon a decision to be formed after their arrival in the city.

The power of taxation by the state is essential to its existence. It is abridged by the federal constitution only as it affects commerce among the several states. There is nothing in the relator's cab service affecting more than one state, or in which the people of other states are interested. The cab contract is not in itself interstate. It is in no sense like the carrying of freight destined for an interior point, and consummated in part by a contract like the one considered in the case of The Daniel Ball, 10 Wall. 557, 19 L. Ed. 999. The relator contends that its cab service is at least incidental to interstate commerce. Only business that is necessarily or essentially connected with interstate commerce is entitled to exemption from the tax. Business only remotely incidental to interstate commerce, like that of conducting a hotel or warehouse or the cab service now under consideration, is not necessarily or essentially connected with interstate commerce. Such business is clearly distinguishable from the maintenance of offices and employment of agents in soliciting interstate freight, as in the case of Norfolk & W. R. Co. v. Pennsylvania, 136 U. S. 114, 10 Sup. Ct. 958, 34 L. Ed. 394. In Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77, in discussing an act fixing a

maximum charge for the storage of grain in warehouses at Chicago and other places, the court say:

"The warehouses of these plaintiffs, in error are situated and their business carried on exclusively within the limits of the state of Illinois. They are used as instruments by those engaged in state as well as those engaged in interstate commerce, but they are no more necessarily a part of commerce itself than the dray or the cart by which, but for them, grain would be transferred from one railroad station to another. Incidentally they may become connected with interstate commerce, but not necessarily so."

In Coe v. Town of Erroll, 116 U. S. 557, 6 Sup. Ct. 475, 29 L. Ed. 715, the court, in considering a question as to local taxation of the products of a state intended for exportation to another state, uses language somewhat applicable to this case. The court in that case say:

"Does the owner's state of mind in relation to the goods—that is, his intent to export them, and his partial preparation to do so—exempt them from taxation? This is the precise question for solution. * * * There must be a point of time when they cease to be governed exclusively by the domestic law, and begin to be governed and protected by the national law of commercial regulation; and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the state of their origin to that of their destination. When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as an entrepôt for that particular region, whether on a river or a line of railroad, such `products are not yet exports, nor are they in process of exportation, nor is exportation begun until they are committed to the common carrier for transportation out of the state to the state of their destination, or have started on their ultimate passage to that state. * * * Although intended for exportation, they may never be exported. The owner has a perfect right to change his mind; and until actually put in motion for some place out of the state, or committed to the custody of a carrier for transportation to such place, why may they not be regarded as still remaining a part of the general mass of property in the state? * * * It is true it was said in the case of The Daniel Ball, 10 Wall. 565, 19 L. Ed. 1002, 'Whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced.' But this movement does not begin until the articles have been shipped or started for transportation from the one state to the other. The carrying of them in carts or other vehicles, or even floating them, to the depot where the journey is to commence, is no part of that journey. That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation. Until actually launched on its way to another state, or committed to a common carrier for transportation to such state, its destination is not fixed and certain. It may be sold, or otherwise disposed of, within the state, and never put in course of transportation out of the state. Carrying it from the farm or the forest to the depot is only an interior movement of the property, entirely within the state; for the purpose, it is true, but only for the purpose, of putting it into a course of exportation. It is no part of the exportation itself. Until shipped or started on its final journey out of the state, its exportation is a matter altogether in fieri, and not at all a fixed and certain thing."

In the case of U. S. v. Boyer (D. C.) 85 Fed. 425, the court say:

"When interstate commerce begins is determined not by the character of the commodity, nor by the intention of the owner who transferred it to another state for sale, nor by his preparation of it for transportation, but by its actual delivery to a common carrier for transportation or the actual commencement of its transfer to another state."

The determination of the comptroller is confirmed, with $50 costs and disbursements. All concur.