## MORRISON MILL CO. v. HARTFORD FIRE INS. CO. OF HARTFORD, CONN.

District Court, W. D. Washington, N. D. March 8, 1929.

No. 12220.

272

Bogle, Bogle & Gates, of Seattle, Wash., for plaintiff.

Cosgrove & Terhune, of Seattle, Wash., for defendant.

NETERER, District Judge (after stating the facts as above). . The scow sinking so soon after sailing, without having encountered violent storms or other adequate cause, created an inference of fact that the cause existed at the time of sailing, and was therefore unseaworthy; and unless this inference of fact is repudiated by the plaintiff, the burden shifts to the plaintiff, and releases the defendant of the burden to show that the scow was unseaworthy. Arnould, § 725.

 The scow had a cargo of 250 tons. It had 54 tons of water in its hold. It was in the water, except 14 inches on the one side and 18 inches on the other side. The testimony is not clear as to the time of inspection before the voyage. The ship carpenter said within a week; but that is not definite. He also said that it was his custom to inspect the scow once each week; but the custom could not have much weight in this issue. It was thoroughly examined during May preceding; but it was moored at the mill dock for at least 14 days—July 17 to July 31. Immediately before the voyage, the additional cargo of 1,620 bundles of box shooks, or approximately 33¾ tons, was loaded. Within 3 hours, without adequate cause, it listed and had taken from 7 to 9 inches of water into its hold, or a total in the hold of 13 inches, and when this was pumped out, within half an hour it took water again to the same depth.

I think it must be obvious that the scow was too deep in the water. With a cargo of 250 tons and water in its hold, it was overloaded, and in this condition, and by reason of exposure while moored at the dock, the seams opened and, on account of the strain in the movement through and depth in the water, caused the scow to fill. Considering all of the ascertainable facts, weighing all the evidence, I am persuaded that the in-

ference of unseaworthiness has developed into a presumption of unseaworthiness, and that by a preponderance and weight of the evidence, establishes the unseaworthiness of the scow at the time of sailing. I am not unmindful of the fact that after salving the cargo and the return of the scow, no impairment was discovered, but the scow had been submerged in the waters of the sea for several days; and it is common knowledge that seams opening under the circumstances could very well close while being submerged.

In Ajum, Goolam, Hossen & Co. v. Union Marine Insurance Co., 9 Aspinall's Reports of Maritime Cases (N. S.) 167, at page 169, Lord Lindley, for the Judicial Committee of the Privy Council, said: "All is conjecture. The real cause of the loss is unknown and cannot be ascertained from the evidence adduced in this connection, but underwriters take the risk of loss from unascertainable causes; and after carefully weighing all of the evidence, bearing in mind the presumption of unseaworthiness on which the underwriters rely, their lordships have come to the conclusion that unseaworthiness at the time of sailing is not proved." In that case the Taif sunk some 19 hours after sailing, without having encountered any weather sufficient to account for the loss; clearly, I think, distinguished from the facts in this case, where all of the positive facts point to a condition with immediate disaster.

I also think that the tug came within the provisions of sections 222 and 223, title 46, USCA. These sections are not limited to passenger boats. These sections come from section 4463, R. S. (Act Feb. 28, 1871, 16 Stat. 446), and applied to passenger vessels only. By the amendment of April 2, 1908 (35 Stat. 55), it applied to any vessel, and this application is carried through all the amendments—March 3, 1913 (37 Stat. 732); March 4, 1915 (38 Stat. 1182). The Congress has control of navigation laws having relation to interstate or foreign commerce, but not over intrastate commerce or navigation. The Gretna Green (D. C.) 20 F. 901, related only to commerce between different points in Kentucky on the Ohio river.

Was the tug in this case engaged in commerce with foreign nations, or among the several states, or with the Indian tribes, by carrying a tow from Anacortes to Seattle? The tug was carrying a tow of box shooks from Anacortes to Seattle, to be reshipped to Honolulu. This was therefore interstate commerce. When the commodity began to move at Anacortes, it began a journey from Anacortes, Wash., to Honolulu. The fact that several different and independent agencies were employed in transporting the commodity, acting in different states or jurisdictions, does not affect the character of the transaction. Justice Field in The Daniel Ball, 10 Wall. (77 U. S.) 557, 19 L. Ed. 999, said:

"In this case it is admitted that the steamer was engaged in shipping and transporting, down Grand river, goods destined and marked for other states than Michigan, and in receiving and transporting up the river goods brought within the state from without its limits; but inasmuch as her agency in the transportation was entirely within the limits of the state, and she did not run in connection with, or in continuation of, any line of vessels or railway leading to other states, it is contended that she was engaged entirely in domestic commerce. But this conclusion does not follow. So far as she was employed in transporting goods destined for other states, * * * she was engaged in commerce between the states, and however limited that commerce may have been, she was, so far as it went, subject to the legislation of Congress. She was employed as an instrument of that commerce; for whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced. The fact that several different and independent agencies are employed in transporting the commodity, some acting entirely in one state, and some acting through two or more states, does in no respect affect the character of the transaction. To the extent in which each agency acts in that transportation, it is subject to the regulation of Congress."

This tug was engaged exclusively in interstate commerce, since the entire cargo was intended for interstate shipment, and it is immaterial that the cargo was to be reshipped on another line from Seattle, since it entered interstate commerce when it left Anacortes. The tug was within the provisions of the sections, supra, and was required to have a crew of master, engineer, and mate, and the fact that the mate quit work shortly before the voyage does not excuse the beginning of the voyage without the mate, since no one was employed in his place. The condition of the policy provided that the scow must be towed by an approved tug. To meet this requirement, a full crew—master, engineer, and mate—was necessary. And pronounced is this requirement, when scows are towed in

tandem. So concluding, it is unnecessary to decide or discuss the other points raised.

An order dismissing the action will be entered on notice.