CUTTING *v.* FLORIDA RY. & NAV. Co. *et al.*, (HARRIS *et al.*, Interven-
ors.) MEYER *v.* SAME. BROWN *v.* SAME. CENTRAL TRUST CO. OF
NEW YORK *v.* SAME. GUARANTY TRUST & SAFE-DEPOSIT CO. *v.* SAME.

*(Circuit Court, N. D. Florida.* June 26, 1891.)

INTERSTATE COMMERCE—STATE RAILWAY COMMISSION.
Orange growers in Florida shipped their fruit from one point in that state to an-
other point in the same state, consigned to their agent at the latter point, for re-
shipment, who immediately forwarded them to their destination in another state.
*Held,* that the shipment from the growers to the forwarding agent was inter-
state commerce, not subject to the control of the Florida Railway Commission. Fol-
lowing *The Daniel Ball,* 10 Wall. 557.

In Equity.
*H. Bisbee,* for intervenors.
*John A. Henderson,* for receiver.

PARDEE, J. The several petitions of intervention are alike in their
allegations, and severally claim that the petitioners shipped over the
Florida Railway & Navigation Company's railroad, then in the possession
of the court, H. Reiman Duval, Esq., receiver, from Citra, Marion county,
Fla., to Callahan, or Baldwin, Fla., and from Wildwood, Sumter county,
Fla., to Baldwin, or Callahan, Fla., between the 1st day of November,
1888, to the 1st day of February, 1890, sundry boxes of oranges, con-
signed to sundry persons, for the carriage and transportation of which
the said receiver demanded and collected 25 cents per box, against the
protests of petitioners; that the railroad commissions, existing and ex-
ercising authority under the laws of the state of Florida, previous to the
shipment of any of said boxes of oranges, had duly fixed the freight
charges for carriage and transportation of the said fruit as 15 cents per
box between the points aforesaid, and had duly issued freight rates, and
notified the said receiver thereof; that they loaded the said fruit upon
the cars furnished by said receiver, and that he was subjected to no ex-
pense or trouble in loading and handling said fruit, and that the whole
service performed by said receiver was in the hauling of said fruit from
the place of shipment to the point of consignment; that the 10 cents per
box in excess of commission rates charged and exacted by the said re-
ceiver for the carriage and transportation of said fruit was unjust and il-
legal; and they pray that the court will decree that the receiver shall
pay the said petitioners the sum of 10 cents per box, so alleged to have
been illegally exacted from them for the carriage and transportation of
said fruit. Said petitions are indorsed, "Filed by leave of the court,"
though the record does not show that any order for filing or for process
or reference was made thereon. No answers appear to have been filed
to the said interventions, but the same appear to have gone to the special
master without being in anywise put at issue. The master heard the
several petitions together, took a large amount of evidence, oral and doc-
umentary, and returned the same to the court without specifically find-

ing any facts in the case, or making any recommendation as to disposition of the cases. Thereupon the petitions have been submitted to the court for determination upon written briefs, as though distinct issues were made on each and every allegation of the several interventions.

As a matter of course, in considering these interventions, the court will take judicial notice of all facts appearing of record in the main suit, particularly with regard to the lines and extent of the Florida Railway & Navigation Company's railroad, and of the financial condition and general management of the property. Baldwin is the station where the Fernandina & Cedar Keys line and the Jacksonville & Chattahoochie line cross; both lines belonging to the Florida Railway & Navigation Company.' Callahan is a station on the Fernandina & Cedar Keys line, in the extreme north-east corner of the state of Florida, near the Georgia state line, where the Florida Railway & Navigation line is crossed by the Savannah, Florida & Western Railway. Neither Baldwin nor Callahan is a town or place of any importance, except from the railroad connection; neither is a market place for oranges, nor a distributing point for such fruit. Citra is a station on the Florida Railway & Navigation Railroad, southern division, in an orange growing and producing country, and is a competitive railway point; the Florida Southern Railway reaching the place via Gainesville. In the year 1888 the Florida Railway Commission established rates·on fruit, oranges, and lemons, carried by the Florida Railway & Navigation Railroad from points within the state to points within the state, fixing extremely low rates in comparison with the rates previously charged. From Citra to Baldwin and Callahan, as points within the state, the rate was fixed at 12 cents per box, 20 per cent. added, making about 15 cents per box. Prior to this, the standard railroad rate between the points in question had been 25 cents per box, with a rebate to Citra shippers of 5 cents per box. At the beginning of the season of 1888, the receiver of the Florida Railway & Navigation Company adopted, under protest, the commission rates, and charged and collected accordingly with regard to shipments over the Florida Railway & Navigation line within the state. At this time a yellow-fever epidemic prevailed in Florida, and railroad business was completely prostrated, trains being run only for the public interest. Under these circumstances, and finding that the commission rates on oranges were unremunerative to the property, and not sufficient for the service rendered, the receiver of the Florida Railway & Navigation Company ordered the old rate of 25 cents per box to be restored, and thereafter on all shipments it was charged. The intervenors are large growers and shippers of oranges from points mainly about Citra, in Florida, to northern and western cities, who, during the season of 1888, under arrangements previously made, shipped large quantities of oranges, shipments in all cases being made to ultimate consignees at points in other states than Florida. Up to December 1st shipments appear to have been regularly made on through bills of lading at the joint rate established by the several lines respectively carrying the goods. After December 1, 1888, in pursuance of an arrangement among orange growers to that end, and with a view

to characterize the shipments as local commerce entirely within the state, so as to claim for such shipments the rates given by the railway commission of the state of Florida, intervenors' consignments were made to an agent at Callahan, although the ultimate destination of the fruit was not changed, nor was the manner of transacting the business substantially changed from what it had been before December 1st. As before, the receiver furnished the cars to carry the fruit to its ultimate destination. At Callahan the goods were not unloaded, bulk was not broken, nor the cars delayed to any extent. As in the case of through shipments generally, the loaded cars were at once transferred to other carriers, to be forwarded to their destination; in other words, the character of the shipment was not changed, but after December 1st, as before, the fruit, when loaded on the cars at Citra, was started for and destined to markets in other states, and then and there at Citra began what was in fact one continuous journey to an ultimate destination without the state of Florida. The difference in the transaction of the business was solely in calling for a local bill of lading instead of a through bill, the interposition of a forwarding agent, and in preparing the charges demanded under protest.

From the evidence submitted, considering all the circumstances attendant upon the carriage of the intervenors' goods, putting aside all considerations arising from the fact that the Florida Railway Commission had established much lower rates between the points in question, the charges actually made by the receiver for the carrying of the goods of the intervenors do not appear to have been unreasonable, nor in any sense illegal or unjust. Section 7 of the interstate commerce act provides—

"That it shall be unlawful for any common carrier, subject to the provisions of this act, to enter into any combination, contract, or agreement, express or implied, to prevent, by change of time schedule, carriage in different cars, or by other means or devices, the carriage of freights from being continuous from place of shipment to place of destination; and no break of bulk, stoppage, or interruption made by such common carrier shall prevent the carriage of freight from being, and being treated as, one continuous carriage from place of shipment to place of destination, unless such break, stoppage, or interruption was made in good faith, for some necessary purpose, and without any intent to avoid or unnecessarily interrupt such continuous carriage, or to evade any of the provisions of this act."

"In this case it is admitted that the steamer was engaged in shipping and transporting down Grand river goods destined and marked for other states than Michigan, and in receiving and transporting up the river goods brought in the state, and without its limits; but in so much as her agency in transportation was entirely within the limits of the state, and she did not run in connection with, or in continuation of, any lines of vessels or railways leading to other states, it is contended that she was engaged entirely in domestic commerce. But this conclusion does not follow. So far as she was employed in transporting goods destined for other states, or goods brought from without the limits of Michigan, and destined to places within that state, she was engaged in commerce between the states; and, however limited that commerce may have been, she was, so far as it went, subject to the legislation of congress. She was employed as an

instrument of that commerce; for, whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced. The fact that several different and independent agencies are employed in transporting the commodity, some acting entirely in one state and some acting through two or more states, does in no respect affect the character of the transaction. To the extent in which each agency acts in that transportation it is subject to the regulation of congress." *The Daniel Ball,* 10 Wall. 557.

The doctrine of *The Daniel Ball* has been repeatedly recognized and approved in later decisions of the supreme court. See *Coe* v. *Errol,* 116 U. S. 517, 6 Sup. Ct. Rep. 475; *Wabash, etc., Ry.* v. *Illinois,* 118 U. S. 557, 7 Sup. Ct. Rep. 4; *Kidd* v. *Pearson,* 128 U. S. 25, 9 Sup. Ct. Rep. 6; *Louisville, etc., Ry. Co.* v. *Mississippi,* 133 U. S. 587, 10 Sup. Ct. Rep. 348; *Norfolk, etc., R. Co.* v. *Pennsylvania,* 136 U. S. 114, 10 Sup. Ct. Rep. 958.

Under the facts of this case and the law, as declared by the supreme court, I have no doubt the commerce of the intervenors in the shipment and transportation of fruit was interstate commerce, and was in no wise under the control and regulation of the Florida Railway Commission. If the rates established by the Florida Railway Commission were not binding on the receiver of the Florida Railway & Navigation Company, then the intervenors have no case, because the proof does not establish that the rates actually charged by the receiver were unreasonable or unjust.

The interventions should be dismissed, and it is so ordered.