### TEXAS & PAC. RY. CO. et al. v. RAILROAD COMMISSION OF LOUISIANA.

(Circuit Court, E. D. Louisiana, Baton Rouge Division.   December 22, 1910.)

#### No. 55.

COMMERCE (§ 34*)—INTERSTATE COMMERCE—RATES—CHARACTER OF SHIPMENT—INTERSTATE OR INTRASTATE SHIPMENT.

Complainant railroad companies filed with the Interstate Commerce Commission a schedule of rates from points in Louisiana to New Orleans for export shipments. The Railroad Commission of Louisiana had also fixed a schedule of different and lower rates on local shipments between the same points. It also by an order allowed 4 days free storage on local shipments and 20 days on shipments intended for export, in which order the railroads acquiesced, and also delivered shipments for export at ship's side free of charge for switching. Certain shipments were delivered to complainants from points in Louisiana for carriage to New Orleans on bills of lading of substantially the local form, and on their arrival the consignees demanded and received the free storage accorded export shipments and free delivery to the vessel carrier; the shipments being delivered by complainants directly from their cars to such carrier, as was intended by the owner when it was shipped. *Held* that, notwithstanding the use of the local bills of lading, the contract between the shippers and complainants was one for an export shipment, over which the Louisiana Railroad Commission had no jurisdiction, and that complainants were entitled, and even required, to charge the rates on such shipments fixed by their schedules filed with the Interstate Commerce Commission.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 34.*]

In Equity. Suit by the Texas & Pacific Railway Company, the St. Louis, Iron Mountain & Southern Railway Company, and the Kansas City Southern Railway Company, against the Railroad Commission of Louisiana. Decree for complainants.

Howe, Spencer & Cocke, Hudson, Potts & Bernstein, and Alexander & Wilkinson, for plaintiffs.
Walter Guion, Atty. Gen., and E. H. McCaleb, Jr., for defendant.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

FOSTER, District Judge. It appears that the Texas & Pacific Railway Company, the St. Louis, Iron Mountain & Southern Railway Company, and the Kansas City Southern Railway Company, complainants herein, had filed with the Interstate Commerce Commission a schedule of rates for the carriage from points in Louisiana to New Orleans on export shipments. The Railway Commission of Louisiana had also fixed a schedule of different and lower rates on local shipments between the same points. By order of the Railway Commission of Louisiana, 4 days free storage was allowed on local shipments, and 20 days on shipments intended for export. The railroads acquiesced in allowing 20 days free storage on freight intended for export and also delivered same at ship's side free of charge for switching.

Thereafter some 21 cars of staves and poplar logs intended for export were shipped from interior points in Louisiana to New Orleans on bills of lading of substantially the local form. On arrival the consignees demanded, and received, the free storage accorded export shipments, and in due course, at their request, the freight was switched to ship's side without additional cost, and was never out of the physical possession of the carriers until actually delivered to the ship. In collecting charges, the said railroads applied the higher rate fixed by the Interstate Commerce Commission for export shipments. On complaint of the consignees, the Railroad Commission of Louisiana assessed certain fines, exceeding $2,000, against complainants, and complainants seek by this proceeding to have the collection of those fines enjoined.

It is contended by complainants that the said shipments constituted foreign commerce, and therefore the Interstate Commerce Commission had jurisdiction over their movement, and the Louisiana Railroad Commission had not. They rely upon the cases of The Daniel Ball, 10 Wall. 557, 19 L. Ed. 999, Coe v. Errol, 116 U. S. 524, 6 Sup. Ct. 475, 29 L. Ed. 715, Swift & Co. v. U. S., 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518, Armour Packing Co. v. U. S., 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681, General Oil Co. v. Crain, 209 U. S. 211, 28 Sup. Ct. 475, 52 L. Ed. 754, and Cutting v. Florida R. & Nav. Co. (C. C.) 46 Fed. 641, and various other decisions to the same effect not necessary to more fully cite. The defendants, on the other hand, say the shipments must be considered intrastate commerce, that the cases above cited do not apply, except the Cutting Case, and this decision is overruled by the case of Gulf, Colorado & Santa Fé R. R. Co. v. Texas, 204 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540, hereafter referred to as the Texas Case, which must be considered the controlling authority.

On the facts as found by him, which are not disputed, the master adopted the contention of defendants, and, basing his conclusions of law entirely on the Texas Case, has recommended that the bill be dismissed. The matter is before me on exceptions of complainants to the master's conclusions of law, and the sole question to be determined is whether the shipments constitute intrastate or foreign commerce.

Undoubtedly the Interstate Commerce Commission has jurisdiction and authority to regulate rates on freight actually moving in foreign commerce, for that part of the carriage through the United States, whether such transportation be interstate or wholly within one state. So, too, the Railroad Commission of Louisiana has authority to regulate rates of transportation on all shipments beginning and ending in the state. In their respective spheres each is supreme, and neither can infringe the authority of the other. But it is plain that both railroad and shipper should be enabled to decide with certainty as to which rules to obey when there is conflict between them, and neither should be permitted to take advantage of the incidental conditions imposed, or privileges allowed, in connection with one rate when applying the other rate to the shipment.

Under the bills of lading, in the instant case, the consignee might have demanded delivery at New Orleans on payment of the lower rate; but he would have received the goods at the depot, or the usual place of delivery, and the railroad was under no obligation to deliver anywhere else; and he would not have been entitled to more than 4 days free storage, nor to any free belting or switching at all. Instead of doing so, however, he notified the railroad to hold the goods for export, and the carrier acquiesced, allowed free storage on the cars at an average of about 14 days, a period far beyond that allowed on local shipments, and subsequently belted the cars to ship's side without extra charge.

I do not consider the facts in the Texas Case analogous. There an interstate shipment terminated at Texarkana, Tex. The freight was paid. Delivery was accepted, and the goods changed ownership. An entirely new shipment was then made to Goldthwaite, Tex. The goods were intended for consumption in Texas, and the shipment began and ended in Texas. The owners of the goods intended to make an intrastate shipment, for the purpose of obtaining the local rate. They made their contract of carriage accordingly, and the whole contract was contained in the bill of lading. By the intention of the owners, by the contract of carriage, and by the ultimate disposition of the goods the shipment was intrastate.

In the instant case the shipments originated in Louisiana, but they did not terminate at New Orleans. The consignees did not accept delivery at all. For the purpose of obtaining the free storage and free switching, allowed only in connection with the export rate, they notified the railroad to hold the goods for export, and subsequently required delivery at ship's side to the connecting carrier. In all of this the railroad acquiesced. The stoppage at New Orleans was merely incidental to the ultimate exporting of the goods. New Orleans was never intended to be, and, in fact, never did become, the final destination. From the time the goods started from the interior point they were intended for foreign consumption, and there was one continuous passage until they reached a destination out of the United States. By the intention of the owners, and the ultimate disposition of the goods, it was an export shipment. In every respect the facts differ from those of the Texas Case, except as to the form of the bill of lading.

In the Texas Case I do not understand the Supreme Court intended to do more than decide the case presented on the facts as found by the Texas courts, and I do not consider the decision at all in conflict with those cited. The whole contract of carriage was expressed in the bill of lading, yet the Supreme Court, in holding that the contract determined the character of the shipment, was careful not to confuse the *bill of lading* with the *contract*. Necessarily a bill of lading, like any other written contract, may be altered, or amended, by subsequent verbal agreement, except as to things against public policy or prohibited by law or valid regulation.

In the case at bar, had the railroad issued through bills of lading from the interior points to the foreign ports, it is conceded by defendants the State Commission could not have imposed the fines. Yet in that case the service would have been exactly the same as was here rendered, with the exception that the railroad would have selected the ocean carrier, instead of the shipper doing so.

I can see no difference in the two cases. It is the trend of modern legislation to allow the shipper great latitude in routing his goods. In the statute of 1910, known as the "Mann-Elkins Act," the interstate shipper is given the right to designate over which of two or more connecting roads his property shall be transported to destination. Act June 18, 1910, c. 309, § 12, par. 5, 36 Stat. 553. It is manifestly of great benefit to the exporter to be allowed to accumulate freight at a seaport, and to hold it for a reasonable time without additional cost. Ocean rates vary according to the supply and demand, and these privileges advantage the exporter in securing favorable rates for the water carriage. I can conceive of no reason why the railroad and shipper, instead of getting out a through bill of lading to the foreign port, should not agree to apply the export rate, with its incidental privileges, to all shipments which are, in reality, intended for export, and to allow the shipper to select the ocean carrier, provided, of course, no fraud or violation of law or public policy is contemplated. If they can do so by express agreement, they can certainly do so by tacit understanding or acquiescence.

In the instant case both parties have treated the shipments as export shipments, and that is what they in fact were. It is not even hinted there was any evasion of law or violation of public policy by their so doing. Therefore I do not think the form of the bill of lading should absolutely fix the status of the freight, as I consider the contract of carriage should be held to be what the parties really intended it to be.

Notwithstanding my great respect for the opinion of the master in this case, I must disagree with him, as I am convinced that as a matter of fact, as well as by the intention of the owners and the contract of carriage, the freight, in the instant case, was an export shipment actually moving in foreign commerce, and the Railroad Commission of Louisiana was without jurisdiction. I am not called upon to reconcile the difference between the rates, nor to pass upon the reasonableness of either. If either is to be amended, it is entirely for the respective railroad commissions to say so. On the facts of this

case, as I understand them, I do not see how the railroads could have demanded or received any other rate than the one they collected.

There will be a decree as prayed for, perpetually enjoining the collection of the fines imposed.