THE ONEIDA FARMERS SHIPPING ASSOCIATION, *Appellee*, v. THE ST. JOSEPH & GRAND ISLAND RAILWAY COMPANY, *Appellant*.

No. 18,297.

SYLLABUS BY THE COURT.

COMMON CARRIERS — *Interstate Railroads — Grain Shipments Within the State with "Milling in Transit" Privileges and "Proportional Rates" on Reshipment to Points Beyond State— Power of State to Enforce Penalty for Delays in Transportation.* In an action under section 7205 of the General Statutes of 1909 by a shipper against an interstate railroad to recover a penalty for delays in the transportation of grain in carload lots from Oneida, Kan., to Elwood, Kan., *held*, (*a*) Under the facts stated in the opinion the action may be maintained. (*b*) Whether the shipment be regarded as completed when the grain was unloaded into the elevator of the purchaser at Elwood, Kan., and therefore intrastate, or whether it was interstate in character—because of a custom and arrangement, of which the plaintiff had no notice or knowledge, which existed between the carrier and the owner of the elevator giving the latter "milling in transit" privileges and "proportional rates" on grain of like quality and quantity when reshipped to points outside the state, nevertheless the state, in the proper exercise of the police power, may enact and enforce reasonable regulations designed to prevent unnecessary delays in such transportation occurring within its borders. (*c*) Section 7205 of the General Statutes of 1909 is a proper exercise of the police power and, applied to the facts of this case, does not place an unreasonable burden upon interstate commerce.

Appeal from Nemaha district court. Opinion filed July 5, 1913. Affirmed.

*R. M. Emery,* of Seneca, *R. A. Brown,* and *L. J. Easton,* both of St. Joseph, Mo., for the appellant.

*Horace M. Baldwin,* of Seneca, for the appellee.

The opinion of the court was delivered by

PORTER, J.: The plaintiff in its petition states a cause of action for the recovery of a penalty under the provisions of section 7205 of the General Statutes of 1909 for an aggregate of twenty-eight days' delay at five dollars per day on fourteen cars of grain loaded at Oneida, Kan., and shipped over defendant's railroad line to the Elwood Grain Company at Elwood, Kan. The answer set up facts showing that the defendant is an interstate railroad engaged in the business of interstate commerce, and alleged that the several cars of grain mentioned in the petition were received for transportation beyond the boundaries of the state of Kansas, and were interstate shipments which were controlled and governed exclusively by the laws regulating interstate commerce. The case was tried to the court and plaintiff was given judgment for the statutory penalty, from which the defendant appeals.

The case was submitted upon a stipulation covering most of the material facts, supplemented by the testimony of the manager of the Elwood Grain Company. The defense to the action is based upon the contention that the shipments of grain became interstate commerce by reason of the subsequent disposition of them by the Elwood Grain Company. The main question discussed, and from the standpoint of the defendant the only question to be determined, is whether the shipments constitute interstate commerce. The ultimate question is whether the nature of the shipments is such that the state has no power to enforce the penalty prescribed by section 7205 of the General Statutes of 1909.

The undisputed facts are: The shipments, which were of grain in carload lots, originated at Oneida,

Kan., and so far as plaintiff had any notice or knowledge terminated at Elwood, Kan. Regular bills of lading were issued showing that the cars were billed by plaintiff to the Elwood Grain Company, f. o. b. Elwood, Kan. On the arrival of the cars at Elwood they were received by the grain company and unloaded into its elevator. The freight charges were paid and deducted from the sales account and the balance of the purchase price remitted to the plaintiff. The grain after being unloaded into the elevator was not consumed there, but was from time to time resold by the Elwood Grain Company and shipped to points outside the state. By an agreement between the grain company and the defendant railroad company the former was given what is known as "transit privileges" and "proportional rates" and "tonnage" allowances for the purpose of giving it a through tariff rate on grain received by it and afterwards reshipped to other points. The method of procedure was for the grain company to surrender the inbound bills—in this case the expense bill of the shipment from Oneida to Elwood. New bills of lading were then issued to the new consignee, and the grain company was allowed a through rate upon the commodity under the tariff regulations in effect at the date of the respective shipments, and was given credit on the new shipment to the amount of freight paid by the plaintiff on the shipment from Oneida to Elwood. By its arrangement with the defendant railroad company, the grain company was entitled to free rates to certain points beyond the state, and to other points of reshipment it was entitled to "proportionate rates." It was shown that the particular cars of grain were not kept separate in the elevator and afterwards loaded and reshipped as individual cars of grain, but grain received from various points was thrown together in the elevator bins. When it was desired to reship, grain of like character and quantity was loaded in cars; and by the arrangement with the defendant the grain company

had and used the privilege of "splitting the tonnage"; so that in several distinct reshipments to outside territory it was given credit of a through tariff and the benefit of the tonnage of the shipments from Oneida to Elwood. The surrender of the inbilling expense bills and crediting the amount upon the new expense bills was solely for the purpose of giving the Elwood Grain Company better transportation rates from Elwood to certain outside points.

There was evidence that the method described resulted in a lower freight rate which inured to the benefit of the producer or shipper; that the privileges derived from transit and proportional rates had a part in fixing the value of grain at St. Joseph or Elwood, and as illustrating this advantage it was shown that the rate from Oneida to Kansas City was the same as the rate from Oneida to St. Joseph, and that, by the surrender of the inbound expense bill from Oneida, the transit to Gower (a point en route between St. Joseph and Kansas City) could be made without cost. It was admitted that the plaintiff had nothing to do with the subsequent transactions, and had no knowledge of them.

The practice of allowing "transit privileges" upon shipments of the character in question has the approval of the Interstate Commerce Commission, and the defendant takes the position that it necessarily follows from this recognition and approval of the methods by which it allowed such privileges to the grain company, that the shipments involved herein were interstate and therefore not subject to the penalty prescribed by the state for unreasonable delay in transportation. The regulations permitting such privileges appear from Bulletin No. 6, of the Conference Rulings of the Commission, issued April 1, 1913, the substance of which was in force at the time the shipments in question were made. Rule No. 203 is as follows:

"A milling, storage, or cleaning-in-transit privilege

can not be justified on any theory except that the identical commodity or its exact equivalent, or its product, is finally forwarded from the transit point under the application of the through rate from original point of shipment. It is therefore not permissible at transit point to forward on transit rate commodity that did not move into transit point on transit rate, or to substitute a commodity originating in one territory for the same or like commodity moving into transit point from another territory, or to make any substitution that would impair the integrity of the through rate. It is not practicable to require that the identity of each carload of grain, lumber, salt, etc., be preserved, but, in the opinion of the Commission, it is not possible to lawfully substitute at the transit point any commodity of a different kind from that which has moved into such transit point. That is to say, oats or the products of oats may not be substituted for corn, corn or the products of corn for wheat, nor wheat or the products of wheat for barley, nor may shingles be substituted for lumber, or lumber for shingles, nor may rock salt be substituted for fine salt, nor fine salt for rock salt; likewise oak lumber may not be substituted for maple lumber, nor pine lumber for either oak or maple, nor may hard wheat, soft wheat, or spring wheat be substituted either for the other. These illustrations are given not as covering the entire field of possible abuses, but as indicating the view which the Commission will take of such abuses as they arise." (p. 58.)

Rule No. 204 reads:

"It is the sense of the Commission that no transit privilege should extend beyond one year." (p. 59.)

In a case involving the application of the principle of "milling in transit" to the manufacture of logs into lumber, Commissioner Prouty said in the opinion:

"It is well understood that at the present time this principle is applied to the movement of many commodities. Generally in its application the raw material pays the local rate into the point of manufacture; when afterwards the manufactured product goes forward it is transported upon a rate which would be applicable to that product had it originated in its manufactured state at the point where the raw material was received

for transportation, whatever has been paid into the mill being accounted for in this final adjustment. Under this or some equivalent arrangement at the present time grain of all kinds is milled and otherwise treated in transit; flour is blended, cotton is compressed, lumber is dressed and perhaps otherwise manufactured; live stock is stopped off to test the market.

"It may be urged with much force that the act to regulate commerce does not sanction arrangements of this kind and the Commission early in its history intimated that such might finally be its conclusion. (*Crews v. Richmond & D. R. Co.,* 1 I. C. C. Rep. 401, 1 Inters. Com. Rep. 703.) Such practices were, however, in use to a considerable extent at the time of the passage of the act and since then they have become universal. To abrogate these privileges would be to confiscate thousands and probably millions of dollars in value by rendering worthless industrial plants which have been constructed upon the faith of their continuation. Nor is it a forced construction of the statute to hold that when the product finally goes forward to the point of consumption it but completes the journey upon which it entered when the raw material was taken up." (*Central Yellow Pine Asso. v. V. S. & P. R. Co. et al.,* 10 I. C. C. Rep. 193, 213.)

Plaintiff claims the question under consideration is settled by the case of *Gulf, Colorado & Santa Fe Ry. Co. v. Texas,* 204 U. S. 403, 51 L. ed. 540. The facts there were in essential respects the reverse of the facts here. The state of Texas sued and recovered from the railway company a penalty for extortion in a charge for the transportation of a carload of corn from Texarkana, Tex., to Goldthwaite, Tex. The Hardin Grain Company at Kansas City had contracted to deliver to Saylor and Burnett at Goldthwaite, Tex., two cars of corn. To fill the order it contracted with the Harroun Commission Company at Kansas City for the purchase of an equal quantity of corn to be delivered to it at Texarkana, Tex. These cars of corn originated at Hudson, S. Dak. They moved under an interstate shipment consigned "Shipper's order notify Harroun

Commission Company, Texarkana, Texas." (p. 405.) The reason why the Hardin Grain Company contracted for the corn to be delivered to them at Texarkana, was because they could fill their contract with Saylor and Burnett at Goldthwaite at about one and one-half cents per bushel cheaper than if they had bought the corn for delivery to them at Kansas City and had shipped it from there to Goldthwaite. Neither the Hardin Grain Company nor the Harroun Commission Company had any store or warehouse at Texarkana, but under an agreement between them the latter, through its agent stationed there, reshipped the corn to Goldthwaite for the Hardin company by bill of lading reciting its receipt from the Hardin Grain Company and consigned to "Shipper's order notify Saylor and Burnett, Goldthwaite, Texas." (p. 407.) The shipment was transferred under original seals and without breaking packages to the Texas & Pacific Railway Company, over which road and the Gulf, Colorado & Santa Fe it was transported to Goldthwaite. When the shipment reached Goldthwaite, Saylor & Burnett, acting for the Hardin Grain Company, tendered the charges prescribed by the state railroad commission. This the agent declined to accept, and demanded and collected a larger sum upon the theory that the transportation to Goldthwaite was part of an interstate shipment. Justice Brewer, in the opinion, said:

"The control over goods in process of transportation, which may be repeatedly changed by sales, is one thing; the transportation is another thing, and follows the contract of shipment, until that is changed by the agreement of owner and carrier. Neither the Harroun nor the Hardin company changed or offered to change the contract of shipment, or the place of delivery. The Hardin company accepted the contract of shipment theretofore made and purchased the corn to be delivered at Texarkana—that is, on the completion of the existing contract. When the Hardin company accepted the corn at Texarkana the transportation contracted for ended. The carrier was under no obligation to

carry it further. It transferred the corn, in obedience to the demands of the owner, to the Texas and Pacific Railway Company, to be delivered by it, under its contract with such owner. Whatever obligations may rest upon the carrier at the terminus of its transportation to deliver to some further carrier, in obedience to the instructions of the owner, it is acting not as carrier, but simply as a forwarder. No new arrangement having been made for transportation, the corn was delivered to the Hardin company at Texarkana. Whatever may have been the thought or purpose of the Hardin company, in respect to the further disposition of the corn, was a matter immaterial so far as the completed transportation was concerned.

"In this respect there is no difference between an interstate passenger and an interstate transportation. If Hardin, for instance, had purchased at Hudson a ticket for interstate carriage to Texarkana, intending all the while, after he reached Texarkana, to go on to Goldthwaite, he would not be entitled on his arrival at Texarkana to a new ticket from Texarkana to Goldthwaite at the proportionate fraction of the rate prescribed by the Interstate Commerce Commission for carriage from Hudson to Goldthwaite. The one contract with the railroad companies having been finished, he must make a new contract for his carriage to Goldthwaite, and that would be subject to the law of the state within which that carriage was to be made.

"The question may be looked at from another point of view. Supposing a carload of goods was shipped from Goldthwaite to Texarkana under a bill of lading calling for only that transportation, and supposing that the laws of Texas required, subject to penalty, that such goods should be carried in a particular kind of car, can there be any doubt that the carrier would be subject to the penalty, although it should appear that the shipper intended, after the goods had reached Texarkana, to forward them to some other place outside the state? To state the question in other words, if the only contract of shipment was for local transportation, would the state law in respect to the mode of transportation be set one side by a federal law in respect to interstate transportation on the ground that the shipper intended, after the one contract of shipment had been completed, to forward the goods to some place outside the state? (*Coe v. Errol,* 116 U. S. 517-527.)

"Again, it appeared that this corn remained five days in Texarkana. The Hardin company was under no obligation to ship it further. It could in any other way it saw fit have provided corn for delivery to Saylor & Burnett, and unloaded and used that car of corn in Texarkana. It must be remembered that the corn was not paid for by the Hardin company until its receipt in Texarkana. It was paid for on receipt and delivery to the Hardin company. Then, and not till then, did the Hardin company have full title to and control of the corn, and that was after the first contract of transportation had been completed.

"It must further be remembered that no bill of lading was issued from Texarkana to Goldthwaite until after the arrival of the corn at Texarkana, the completion of the first contract for transportation, the acceptance and payment by the Hardin company. In many cases it would work the grossest injustice to a carrier if it could not rely on the contract of shipment it has made, know whether it was bound to obey the state or federal law, or, obeying the former, find itself mulcted in penalties for not obeying the law of the other jurisdiction, simply because the shipper intended a transportation beyond that specified in the contract. It must be remembered that there is no presumption that a transportation when commenced is to be continued beyond the state limits and the carrier ought to be able to depend upon the contract which it has made and must conform to the liability imposed by that contract." (p. 412.)

While we are not willing to go so far as to say that plaintiff is correct in assuming that the opinion quoted from settles the question of the character of the shipments involved in the present case, it is true that much of the reasoning upon which the opinion is based applies with force to the situation here. If the test of an interstate shipment, as this and other cases by the same court indicate, is not the intention of the consignee but the nature of the transaction, the facts in the present case would make the shipment from Oneida, Kan., to Elwood, Kan., intrastate and not interstate. When the grain company accepted the grain at Elwood it

seems that the transportation contracted for by the plaintiff ended. The carrier was under no obligation, so far as the original contract was concerned, to carry it further. The arrangement between the defendant and the grain company, the consignee, was one with which the shipper who made the contract with the defendant had nothing to do and of which it did not even have notice. It can hardly be contended that any new arrangement had actually been made for transportation to outside points before the shipment to Elwood was completed. It is true, a custom of business prevailed between the consignee and the defendant railroad company by which the former, in case it so elected, might at any time within one year reship the grain and have credit on the new rate to the amount paid on the initial shipment; but before any election was made the transportation between Oneida and Elwood seems to have been a completed transaction. The cars of grain had been received and unloaded by the consignee, and the proceeds less the freight charges had been paid to the shipper, who had no further possible interest in the transaction.

In support of the contention that the shipments in question are interstate in character the defendant, appellant, relies with confidence upon a number of authorities, among which are: *So. Pac. Terminal Co. v. Int. Comm. Comm.*, 219 U. S. 498, and *Railroad Commission v. Worthington*, 225 U. S. 101, 56 L. ed. 1004.

These, being in many respects analogous cases, will be considered together. In the first, the terminal company was held to be a common carrier engaged in interstate commerce as part of the Southern Pacific Railroad & Steamship System, its piers being mere facilities for import and export traffic at the port of Galveston. Its arrangement with Young enabled him to increase his business largely and rapidly. The business consisted in buying cottonseed cake in the in-

18—90 KAN.

terior, shipping to himself in carload lots at the piers, there grinding it into meal and sacking and loading into steamships for export. He was the initial shipper from the interior points to himself as consignee at the port of Galveston, from which he reshipped to the export trade; and the whole transaction was over one line of transportation, the milling in transit being a mere incident. The point decided was that the terminal facilities, though nominally owned and operated by the terminal company, were mere links in a chain of interstate transportation, and that the arrangement with Young in effect gave him an undue preference over other shippers; and that where a means of interstate transportation is used for that purpose, the traffic comes under the jurisdiction of the Interstate Commerce Commission.

In *Railroad Commission v. Worthington,* supra, the facts were these: Coal was shipped from mines in Ohio to Huron or Cleveland on Lake Erie marked "Lake Coal," and consigned by rail to the operator, or some office employee whose name was used for convenience, for the purpose of designating the particular grade of coal. When a vessel arrived the cars were moved onto the dock and loaded into the vessel. When the coal left the mines its ultimate destination was not known, and sometimes it was sold and vessels arranged for after the coal reached the lake ports. When loaded on vessels it was carried to points in Canada. The railroad commission of Ohio ordered in a rate of 70 cents per ton on the coal from the mines to the lake. The court, upon the facts, held that "by any fair test the transportation of this coal from the mine to the upper lake ports is an interstate carriage." It appears that the coal was sometimes sold "f. o. b. vessel" and billed to the shipper, and that the carrier owned and controlled the facilities for unloading from its cars upon the docks and reloading into the vessels. In the syllabus it was ruled that the order of the state railroad

commission was an unlawful attempt directly to regu-
late interstate commerce because it established a rate
on "lake cargo coal" which was billed from Ohio coal
fields to Ohio ports on Lake Erie, "where such rate is
applicable only to such coal as is in fact placed upon
vessels at those ports for carriage to points outside the
state, and covers the actual placing of such coal upon
the vessels, and the trimming or distributing of it in
the holds of the vessel so that the vessels may safely
proceed upon their interstate journey."

In the opinion it was said:

"But it must always be remembered that this 70-cent
rate applies solely to such coal as is in fact placed upon
vessels for carriage to beyond the state points;   .   .   .
and the rate fixed by the commission which is in con-
troversy here, is applicable alone to coal which is thus,
from the beginning to the end of its transportation, in
interstate carriage, and such rate is intended to and
does cover an integral part of that carriage, the trans-
portation from the mines to the Lake Erie port, the
placing upon the vessel, the trimming or distributing
in the hold, if required."   (p. 108.)

In distinguishing the above case from *Gulf, Colorado*
*& Santa Fe Ry. Co. v. Texas*, 204 U. S. 403, the court
said:

"This was held to be an intrastate shipment un-
affected by the fact that the shipper intended to reship
the corn from Texarkana to Goldthwaite.   .   .   .
There a new and independent contract for intrastate
shipment was made, the interstate transportation
having been completely performed; here a rate is fixed
on that part of an interstate carriage which includes
the actual placing of the coal into vessels ready to be
carried beyond the destination."   (225 U. S. 109.)

The case referred to in a former part of this opinion,
*Central Yellow Pine Asso. v. V., S. & P. R. Co. et al.*,
10 I. C. C. Rep. 193, is also relied upon by the defend-
ant.   That is the case where the "milling in transit"
principles were applied to the shipment of logs to the
mill and their reshipment as lumber, but the lumber

company owned the lands from which the logs were cut as well as the mills where they were sawed, and logs and lumber were shipped by the same consignor. Other cases cited by the defendant are: *Texas & Pac. Ry. Co. v. Railroad Com'n of Louisiana,* 183 Fed. 1005; *Cutting v. Florida Ry. & Nav. Co.,* 46 Fed. 641; *The Daniel Ball,* (10 Wall.) 77 U. S. 557, 564, 19 L. ed. 999; *J. Rosenbaum Grain Co. v. Chicago, R. I. & P. Ry. Co.,* 130 Fed. 46; *Henry A. Klyce Co. v. I. C. R. R. Co.,* 19 I. C. C. Rep. 567.

It is impossible, within the limits of this opinion, to discuss all of them. In some of the cases the interstate character of the shipments was conceded. In others the only question involved was the propriety of permitting the use of inbound expense bills on reshipments after milling or elevation in transit. There is a wilderness of cases involving transit privileges and reconsignment rates, an elaborate discussion of which can be found in sections 45, 189, 190 *et seq.* of volume 1 of Drinker's "The Interstate Commerce Act." The author says that it is not possible to reconcile all the statements and *dicta* contained in the numerous discussions of the courts and rulings of the Interstate Commerce Commission upon the subject. In its earlier rulings the Interstate Commerce Commission went so far as to hold that:

"The fact that the owner of merchandise which is offered to a carrier for transportation from one point to another in the same State intends to have it further transported by a second carrier into another State does not make such first transportation interstate commerce, or render the carrier subject to the control of the Commission in respect to it, even though such first carrier may be informed of the ultimate destination of the merchandise." (*Mo. & Ill. Ry. Tie & Lbr. Co. v. Cape Girardeau & Southwestern Ry. Co.,* 1 I. C. C. Rep., 30, headnote.)

Again, in *The Ch., R. I. & Pac. Ry. Co. v. The Ch. & Alt. R. Co.,* 3 I. C. C. Rep. 450, the commission held

that where the original contract provided that the shipper might stop the cattle at an intermediate point to test the market, and at his option reship to points beyond, the reshipment was not a part of the through haul, there being no absolute contract for reshipment. In a number of more recent rulings the exact contrary is held. (See cases cited in 1 Drinker's "The Interstate Commerce Act," § 45, note.) The supreme court of the United States, in considering the question as to when a shipment begins to move in interstate commerce, said in the case of *Coe v. Errol,* 116 U. S. 517:

"There must be a point of time when they cease to be governed exclusively by the domestic law and begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their · final movement for transportation from the State of their origin to that of their destination. . . . 'Whenever a commodity has begun to move as an article of trade from one State to another, commerce in that commodity between the States has commenced.' (*The Daniel Ball,* 10 Wall. 557, 565.) But this movement does not begin until the articles have been shipped or started for transportation from the one State to the other. . . . Until actually launched on its way to another State or committed to a common carrier for transportation to such State its destination is not fixed and certain. It may be sold or otherwise disposed of within the State and never put in course of transportation out of the State. . . . Until shipped or started on its final journey out of the State its exportation is a matter altogether *in fieri* and not at all a fixed and certain thing." (pp. 525, 528.)

Upon the facts in this case the Interstate Commerce Commission would doubtless assume jurisdiction over any controversy that might arise in respect to the use of inbound expense bills and the allowance of a proportional tariff on the reshipment, and probably the courts would uphold its jurisdiction. In the numerous · cases upon the vexed question of proportional rates and reconsignment charges there are statements and

*dicta* intimating that if the commission has jurisdiction of the rates to be charged it is solely upon the principle that "when the completed product finally goes forward to the point of consumption, it but completes the journey upon which it entered at the beginning," and the whole transaction is interstate in character.

The court is inclined to rest its affirmance of the decision of the lower court upon the broader ground that the transaction, whatever it may be designated, is not of such a character as to deprive the state of the right to exercise its police power over that part of the transportation which took place wholly within the limits of the state. In *Larabee v. Railway Co.,* 74 Kan. 808, 88 Pac. 72, it was held:

"The internal movement of property is not freed from state control until after it has been finally released by the consignor to a carrier for transportation to a destination fixed beyond the state line; and under the facts of this case such control is not lost until after the freight has been billed to its destination.

"The switching of cars, loaded with freight afterward transported to another state, which is purely local, which is independently contracted for, which has no relation to the contract of carriage under which the freight is removed beyond the border of the state, which has no relation to the ultimate destination of the cars, and which begins and ends before the destination of any car handled is fixed, is a mere preliminary incident to interstate commerce and subject to state control." (Syl. ¶¶ 5, 6.)

In affirming the decision the United States supreme court in *Missouri Pacific Ry. v. Larabee Mills,* 211 U. S. 612, expressly declined to rest its decision upon any distinction between interstate commerce and that wholly within the state (p. 621), and upheld the principle that in the absence of any express action by congress the state may regulate many matters which indirectly affect interstate commerce. The opinion, by Justice Brewer, cites numerous cases in which it was held that certain regulations were not unreasonable,

nor in any just sense restrictions upon interstate commerce; such, for instance, as those requiring engineers to be examined from time to time to test their ability to distinguish colors (*Nashville &c. Railway v. Alabama,* 128 U. S. 96) ; requiring telegraph companies to receive dispatches and to transmit and deliver them with due diligence as applied to messages from outside the state (*Western Union Telegraph Co. v. James,* 162 U. S. 650) ; forbidding the running of freight trains on Sunday (*Hennington v. Georgia,* 163 U. S. 299) ; and numerous other matters. (See cases cited in the opinion.) In answer to the objection that congress had already acted by creating the Interstate Commerce Commission, Justice Brewer said that this fact did not, in the absence of action by it, change the rule which existed prior to the commission, and further said:

"A mere delegation by Congress to the commission of a like power has no greater effect, and does not of itself disturb the authority of the State. It is not contended that the commission has taken any action in respect to the particular matter involved. It may never do so, and no one can in advance anticipate what it will do when it acts. Until then the authority of the State in merely incidental matters remains undisturbed." (211 U. S. 623.)

In *The Minnesota Rate Cases,* 230 U. S. 352, decided within the past thirty days, the United States supreme court reaffirmed the doctrine that state regulation of interstate traffic to be unlawful must be direct and not the merely incidental effect of the exercise by the state of its police powers. The court quotes (p. 428) with approval the following language from the opinion in *Louisville and Nash. R'd Co. v. Kentucky,* 183 U. S. 503:

"It may be that the enforcement of the state regulation forbidding discrimination in rates in the case of articles of a like kind carried for different distances over the same line may somewhat affect commerce generally; but we have frequently held that such a result is too remote and indirect to be regarded as an

interference with interstate commerce; that the interference with the commercial power of the general government to be unlawful must be direct, and not the merely incidental effect of enforcing the police powers of a state." (p. 518.)

Mr. Justice Hughes, who spoke for the court, refers to the Larabee mills case, and in the opinion said:

"The question we have now before us, essentially, is whether after the passage of the Interstate Commerce Act, and its amendment, the State continued to possess the state-wide authority which it formerly enjoyed to prescribe reasonable rates for its exclusively internal traffic. That, as it plainly appears, was the nature of the action taken by Minnesota, and the attack, however phrased, upon the rates here involved as an interference with interstate commerce, is in substance a denial of that authority.

"Having regard to the terms of the federal statute, the familiar range of state action at the time it was enacted, the continued exercise of state authority in the same manner and to the same extent after its enactment, and the decisions of this court recognizing and upholding this authority, we find no foundation for the proposition that the act to regulate commerce contemplated interference therewith.

"Congress did not undertake to say that the intrastate rates of interstate carriers should be reasonable or to invest its administrative agency with authority to determine their reasonableness. Neither by the original act nor by its amendment, did Congress seek to establish a unified control over interstate and intrastate rates; it did not set up a standard for intrastate rates, or prescribe, or authorize the Commission to prescribe, either maximum or minimum rates for intrastate traffic. It can not be supposed that Congress sought to accomplish by indirection that which it expressly disclaimed, or attempted to override the accustomed authority of the states without the provision of a substitute. On the contrary, the fixing of reasonable rates for intrastate transportation was left where it had been found; that is, with the states and the agencies created by the states to deal with that subject. (*Missouri Pacific Ry. Co. v. Larabee Mills*, 211 U. S. 612, 620, 621.)" (p. 420.)

There is no contention in the present case that congress, by itself or through the commission, has taken any action looking toward the exercise of control over delays in transportation such as those complained of by the plaintiff. If the state may require telegraph companies to receive and transmit interstate messages with diligence and impose reasonable penalties for failure to do so, as held in *Western Union Telegraph Co. v. James,* 162 U. S. 650; then upon the same principle, so long as congress has not already acted upon the matter of delays in the transportation of interstate shipments, the state, we think, in the proper exercise of the police power, may enact and enforce reasonable regulations designed to prevent unnecessary delays in such shipments occurring wholly within its borders. The questions raised by the appeal have been ably presented, orally and in the briefs.

. The judgment is affirmed.